UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| DEPUY ORTHOPAEDICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:12-CV-299-CAN |
| | ) | |
| ORTHOPAEDIC HOSPITAL, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**OPINION AND ORDER**

Hopeful that by sharing research and resources patentable orthopaedic products could be produced, the parties, DePuy Orthopaedics, Inc. ("DePuy"), an Indiana medical device manufacturer, and Orthopaedic Hospital ("the Hospital" or "OH"), a California research hospital, entered into two contracts, a Research Agreement and a Patent Rights and License Agreement ("the PRLA"). This case arose from disputes over the terms of the PRLA. Under the PRLA, DePuy agreed to assume financial responsibility for prosecuting, maintaining, and enforcing related patent rights; to develop and market products that used any of the new technology; and to pay the Hospital royalties on any net sales of products incorporating the new technology. In return, DePuy retained a license to use the technology before and after it was patented.

Now, almost sixteen years after executing the PRLA, the Hospital and DePuy have each presented this Court with a motion for partial summary judgment regarding the meaning and application of the PRLA. Having reviewed the parties' written and oral arguments, the Court issues the following opinion and order, denying the Hospital's motion and granting in part and denying in part DePuy's motion, pursuant to the consent of the parties and 28 U.S.C. § 636(c).

**I.  RELEVANT BACKGROUND**

The following facts are primarily not in dispute. Where the facts are in dispute, this Court has determined that the disputes are either not material or has chosen to address such disputes in the Court's substantive analysis of the issues.

On March 1, 1999, the Hospital and DePuy executed two agreements, the Research Agreement [Doc. No. 83-3] and the PRLA [Doc. No. 78-1]. The two agreements memorialized the terms of the parties' relationship related to their joint efforts in researching, developing, and applying new technology that would improve the wear characteristics of polyethylene bearings in orthopaedic implants. While there were no patents in place when the agreements were executed, the parties drafted the PRLA anticipating that patent applications would result from their work together. As such, the PRLA contemplated and outlined the parties' rights and obligations related to the uncertain and undefined technology that might (or might not) have come into existence as a result of the parties' work under the Research Agreement.

The parties' agreements provided that any intellectual property rights resulting from the parties' joint research and development efforts would either be owned by the Hospital or co-owned by the Hospital and DePuy. Regardless, DePuy accepted a license as to those rights, even related to co-owned rights, in exchange for royalty payments to the Hospital on sales of products incorporating claims from patents or patent applications. DePuy also agreed to prosecute any patent applications, and to maintain and enforce any patents obtained, on behalf of the Hospital.

In March 1999 when the agreements were executed, no patent applications had been filed related to the parties' research on polyethylene bearings and no patents had issued. By April 2001, however, the Hospital had filed an international patent application related to an oxidation-resistant polyethylene and a method of making it. That application led the Hospital to file

applications related to the same technology in the United States, Australia, Europe, and Japan. These applications are collectively referred to as the "110 cases." In compliance with the PRLA, DePuy worked with its own attorneys, outside counsel, and Dr. Harry McKellop of the Hospital to prosecute the patent applications related to the 110 cases for several years. After March 1, 2006, patents issued in Australia, Europe, and Japan. In February 2014, one of the U.S. applications, originally filed on May 24, 2007, issued as U.S. Patent No. 8,658,710 ("the '710 Patent"). In August 2014, a second U.S. application issued as U.S. Patent No. 8,796, 347.

On February 16, 2012, however, two years before the U.S. patents issued, DePuy's Vice President for Medical Affairs, Tony Cutshall, sent a letter ("the Cutshall Letter") to Dr. Harry McKellop, the Hospital's Vice President of Research, informing him that the PRLA had expired on March 1, 2006, pursuant to Section 10.1, which provides for expiration of the PRLA after seven years if no patents had issued or the PRLA had not otherwise terminated. *See* Doc. No. 78-1 at 10 (PRLA § 10.1); Doc. No. 83-11 at 2 (the Cutshall Letter). In the Cutshall Letter, DePuy also informed the Hospital that it would not continue to pay the costs of patent prosecution or any royalties related to the PRLA. Doc. No. 83-11 at 2.

DePuy sent the Cutshall Letter about a month after it launched its AOX Antioxidant Polyethylene ("AOX"), a product used in artificial knees that the Hospital alleges incorporated technology from the 110 cases. On March 27, 2012, Dr. McKellop sent a letter to Cutshall disputing the expiration of the PRLA and asserting that DePuy's refusal to pay royalties on its AOX sales constituted breach of the PRLA. Doc. No. 83-12 at 2.

On June 11, 2012, DePuy filed its lawsuit in this Court seeking declaratory judgment as to its rights and obligations under the PRLA (Cause No. 3:12-cv-299, hereinafter "the '299

case"). Specifically, DePuy asked the Court to declare that the PRLA had expired on March 1, 2006, and that DePuy had not breached the PRLA by selling products incorporating parts made of its AOX polyethylene without paying royalties to the Hospital, or by any other act or omission. ['299 case, Doc. No. 1 at 7].

On September 28, 2012, DePuy sent a second letter to the Hospital ("the Tomko Letter") reiterating its position in the February Cutshall Letter, but also providing, alternatively, formal notice under Section 6.5 of the PRLA that it was abandoning the 110 cases and transitioning their ownership to the Hospital. Doc. No. 83-13 at 2–3. Through the Tomko Letter, DePuy further emphasized that "the '110' cases are not subject to the [PRLA], that Orthopaedic Hospital is free to license those patents and patent applications to others, and that DePuy is not licensed under those patents and patent applications." *Id.* at 3.

On December 28, 2012, the Hospital filed its first lawsuit against DePuy in the Central District of California alleging that DePuy breached the PRLA in multiple ways, including failing to pay royalties and failing to prosecute, maintain, or enforce applicable patent applications or patents. (Cause No. 3:13-cv-384, hereinafter "the '384 case"). In the '384 case, the Hospital also asserted equitable and tort claims against DePuy related to its obligations under the PRLA. The Central District of California transferred the case to this Court, which consolidated it into the '299 case on June 18, 2013.

Despite these lawsuits, the Hospital continued to prosecute the patent applications related to the 110 cases on its own. In February 2014, the '710 patent issued. Based on the '710 patent, the Hospital filed its second lawsuit, a patent infringement action against DePuy, in the Central District of California on February 24, 2014. (Cause No. 3:14-cv-608, hereinafter "the '608

case"). In its responsive pleading filed on April 22, 2014, DePuy asserted an affirmative defense and a counterclaim that the '710 patent is invalid. ['608 case; Doc. No. 31 at 5, 8]. Once again, the California court transferred the case to this Court, which consolidated it into the '299 case on June 15, 2014.

On September 19, 2014, with the agreement of the parties, the Court developed a phased litigation plan whereby the parties' would first submit motions for partial summary judgment as to the contract interpretation claims related to the PRLA. Specifically, the Court ordered DePuy to file a motion for partial summary judgment as to the meaning and application of Section 6.5 of the PRLA; and ordered the Hospital to file a motion for partial summary judgment as to whether DePuy is allowed to challenge the validity of the Hospital's patents. Doc. No. 74 at 2. DePuy and the Hospital timely filed these motions, which are now ripe and before the Court.

II. **ANALYSIS**

   A. **Summary Judgment Standard of Review**

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Lawson v. CSX Transp., Inc*., 245 F.3d 916, 922 (7th Cir. 2001). In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the nonmoving party as well to draw all reasonable and justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986); *Healy v. City of Chicago*, 450 F3d 732, 738 (7th Cir. 2006).

To overcome a motion for summary judgment, the nonmoving party cannot rest on the mere allegations or denials contained in its pleadings. Rather, the nonmoving party must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex v. Catrett*, 477 U.S. 317, 322–23 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). Where a factual record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In other words, "[s]ummary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted).

**B.      Contract Interpretation Standard**

Indiana law governs the contract interpretation issues raised in this case based on the parties' choice of law agreement reflected in Section 13.5 of the PRLA. "Summary judgment is particularly appropriate in cases involving the interpretation of contracts." *Murphy v. Keystone Steel & Wire Co., a Div. of Keystone Consol. Indus.*, 61 F.3d 560, 564–65 (7th Cir. 1995); *ECHO, Inc. v. Whitson Co.*, 52 F.3d 702, 705 (7th Cir. 1995).

Under Indiana law, the primary goal in contract interpretation is to ascertain and effectuate the intent of the parties in executing the contract. *MPACT Constr. Group, LLC v. Superior Concrete Constructors, Inc.*, 802 N.E.2d 901, 906 (Ind. 2004). The parties' intent is determined by review of the parties' "expressions within the four corners of the written instrument." *Roy A. Miller & Sons, Inc. v. Indus. Hardwoods Corp.*, 775 N.E.2d 1168, 1172

(Ind. Ct. App. 2002). In assessing the intent of the parties, the threshold question is whether the contract, or any relevant provision, is ambiguous. If the language of a contract is clear and unambiguous, the court must give the contract's language its plain and ordinary meaning as a matter of law without considering any extrinsic evidence. *USA Life One Ins. Co. v. Nuckolls*, 682 N.E.2d 534, 538 (Ind. 1997); *Barclay v. State Auto Ins. Cos.*, 816 N.E.2d 973, 975 (Ind. Ct. App. 2004). "In applying this standard, courts will give a word or phrase its usual meaning unless the contract, when taken as a whole and considering its subject matter, makes clear that the parties intended another meaning." *Trs. of First Union Real Estate Equity & Mortg. Invs. v. Mandell*, 987 F.2d 1286, 1290 (7th Cir. 1993). In addition, "a contract will not be interpreted literally if doing so would produce absurd results, in the sense of results that the parties, presumed to be rational persons pursuing rational ends, are very unlikely to have agreed to seek." *Beanstalk Grp., Inc. v. AM Gen. Corp.*, 283 F.3d 856, 860 (7th Cir. 2002). Moreover, courts must look beyond the literal meaning of a single provision to interpret the contract as a whole. *Id.*

However, a contract is not ambiguous simply merely because "each party favors a different interpretation." *N. Ind. Commuter Transp. Dist. v. Chi. SouthShore & S. Bend R.R.*, 744 N.E.2d 490, 496 (Ind. Ct. App. 2001). Rather, "a contract is ambiguous only if reasonable persons would differ as to the meaning of its terms." *IP of A W. 86th St. 1, LLC v. Morgan Stanley Mortg. Capital Holdings, LLC*, 686 F.3d 361, 367–68 (7th Cir. 2012) (internal quotations omitted); *see also Beam v. Wausau Ins. Co.*, 765 N.E.2d 524, 528 (Ind. 2002). If a contract is ambiguous, the court may consider extrinsic evidence to glean the parties' intent. *Cummins v.McIntosh*, 845 N.E.2d 1097, 1106 (Ind. Ct. App. 2006).

### C.     The Hospital's Motion for Partial Summary Judgment, Doc. No. 75

In its motion, the Hospital asks the Court to strike DePuy's affirmative defense and counterclaim alleging the invalidity of the '710 patent. The Hospital contends that DePuy is estopped from challenging the validity of the '710 patent based either on the theory of contractual estoppel or the equitable doctrine of judicial estoppel. Under its contractual estoppel theory, the Hospital alleges that the last sentence of Section 6.5 of the PRLA constitutes a "no challenge" provision that must be honored. Alternatively, the Hospital argues that even if the contractual provision does not constitute an explicit "no challenge" provision, DePuy should be judicially estopped from challenging the validity of the '710 patent for equitable reasons. Neither of these theories can succeed because of limitations imposed by the Supreme Court in *Lear, Inc. v. Adkins*, 395 U.S. 653, 670–71 (1969).

  **1.  Under *Lear*, DePuy cannot be prevented from challenging the validity of the '710 patent even if the PRLA includes a no-challenge provision.**

Despite the Hospital's best attempts to minimize, or even negate, the applicability of *Lear* to this case, the Court cannot ignore its principles especially because the material facts here are so similar to those in *Lear*. In *Lear*, a corporate manufacturer hired an individual inventor to develop improvements in gyroscope technology that were essential to the competitiveness of the manufacturer's products in the aviation industry. The inventor and the manufacturer entered into an agreement whereby the inventor retained ownership of all ideas, discoveries, and inventions arising from his work with the manufacturer. Through the agreement, the inventor also promised, in a very general sense, to grant the manufacturer a license "on a mutually satisfactory royalty basis" that would allow the manufacturer to use all the ideas the inventor might develop. *Lear*, 395 U.S. at 657.

With only the general agreement in place, the inventor developed the requested improvements and the manufacturer quickly incorporated them into its production process. The inventor then filed a patent application after which he promptly negotiated a detailed license agreement with the manufacturer establishing clear royalty obligations. The manufacturer immediately started paying royalties on the unpatented ideas it had incorporated into its process but then stopped before the patent issued having become convinced that the patent would never issue because of recently located and controlling prior art. After the patent issued, the inventor sued the manufacturer for royalties arguing that the license agreement required the manufacturer to pay royalties accruing before the patent issued and through the entire patent period regardless of the patent's validity.

In its opinion, the Court in *Lear* analyzed the effects of federal patent policy on contractual doctrines. The Court explained that federal patent policy favors patent validity challenges as a method of protecting the public's interest in "full and free competition in the use of ideas which are in reality a part of the public domain," or in other words, weeding out bad patents. *Id.* at 670. The Court found that the the public's interest in ensuring the validity of patents outweighed the "technical requirements of contract doctrine" intended to "balance the claims of promisor and promisee in accord with the requirements of good faith." *Id.* As a result, the Court held that even a clear contractual provision could not preclude the manufacturer from challenging the validity of the inventor's patent noting the unique economic incentive of licensees, like the manufacturer, to raise such challenges. *Id.*

As the Hospital correctly notes, *Lear* does not make every no-challenge provision unenforceable. Instead, *Lear* requires each court reviewing such provisions, and license

agreements generally, to ascertain whether federal patent policy or contract law doctrines should govern in light of the unique facts of each case. Such an approach is consistent with the Supreme Court's approach to contracts subject to federal policy in other areas of law as well. *See, e.g.*, *M & G Polymers USA, LLC v. Tackett,* 574 U.S. ___ 2015, No. 13-1010, 2015 WL 303218, at *6 (Jan. 26, 2015) ("We interpret collective-bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy.").

Since *Lear* in 1969, the Federal Circuit has balanced federal patent policy with contract principles in determining the enforceability of particular no-challenge provisions. Despite the abrogation of licensee estoppel in *Lear*, the Federal Circuit has enforced no-challenge clauses in two limited situations, neither of which are present here. *See Gen-Probe Inc. v. Vysis, Inc.*, 3539 F.3d 1376, 1381 (Fed. Cir. 2004) (collecting cases).

First, public policies related to finality justified the court's decisions to enforce no-challenge provisions in settlement agreements and consent decrees, especially those reached late in litigation. *See, e.g.*, *Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1370 (Fed. Cir. 2001) (holding that a no-challenge clause in a settlement agreement reached after the accused infringer had already challenged patent validity, had the opportunity to conduct discovery regarding validity, and elected to dismiss the litigation with prejudice based on the terms of the settlement agreement contractually estopped the accused infringer from challenging the patent's validity in subsequent litigation); *Foster v. Hallco Mfg. Co., Inc.*, 947 F.2d 469, 474–77 (Fed. Cir. 1991) (refusing to apply *Lear*'s express preference for favoring challenges to patent validity in light of general principles of *res judicata* at play in consent judgments like the one presented in *Foster*).

10

The Federal Circuit further limited such contractual estoppel to situations where the "no-challenge" provision in the settlement agreement or consent decree is clear and unambiguous. *Baseload Energy, Inc.*, *v. Roberts*, 619 F.3d 1357, 1361–62 (Fed. Cir. 2010); *see also Ecolab, Inc. v. Paraclipse, Inc.*, 285 F.3d 1362, 1377 (Fed. Cir. 2002) (holding that a statement within a consent decree that a patent was valid was not sufficiently clear to preclude a future validity defense); *Flex-Foot*, 238 F.3d at 1370 (estopping a validity challenge based on the clear and unambiguous waiver of future patent validity challenges in the parties' settlement agreement); *Diversey Lever, Inc. v. Ecolab, Inc.*, 191 F.3d 1350, 1352 (Fed. Cir. 1999) ("[A]ny surrender of the right to challenge validity of a patent is construed narrowly.").

Second, the Federal Circuit has also estopped assignors of patents from raising invalidity claims against the assignee. *Diamond Scientific Co. v. Ambico, Inc.*, 848 F.2d 1220, 1224 (Fed. Cir. 1988). Assignor estoppel is based on the equitable conclusion that an "assignor should not be permitted to sell something and later to assert that what was sold is worthless, all to the detriment of the assignee" who already compensated the assignor fully. *Id.*

The court recognized these narrow exceptions having distinguished the facts in these cases from the facts in *Lear*. For instance, unlike the agreement at issue in *Lear*, the relevant contracts in these exceptions actually included no-challenge provisions. Additionally, the purpose, nature, and timing of the contracts in these cases presented policy concerns regarding the finality of judgments and the assignor-assignee relationship not present in *Lear*. In this case, however, the Hospital is hard pressed to distinguish the material facts and accompanying public policies at play in the PRLA from the binding principles announced in *Lear*.

First, like the situation in *Lear*, this case is a bit unusual in that the parties executed the PRLA, the license agreement, before any related patent issued. Additionally, the PRLA provided for royalties on unpatented ideas while the patent application was pending. Second, like the agreement in *Lear*, the PRLA probably does not include a no-challenge provision despite the Hospital's arguments to the contrary. The Hospital contends, and DePuy disputes, that the last sentence of Section 6.5 is a no-challenge provision that must be honored in order to avoid absurd results in light of the contract as a whole. The last sentence of Section 6.5 states: "In such case, DEPUY shall use reasonable efforts to ensure its investigators cooperate fully with OH to enable OH, as needed, to obtain, maintain, or enforce Patent Rights." Doc. No. 78-1 at 7.

In support, the Hospital argues that asserting an invalidity defense against the '710 patent as DePuy has done in this litigation, or even petitioning the PTO to institute an IPR against the '710 patent as DePuy has threatened, is "the antithesis of 'full cooperation' to 'maintain or enforce' that patent" and is therefore inconsistent with the purpose of the PRLA. Doc. No. 98 at 6; *see also* Doc. No. 76 at 17. The Hospital relies upon a comparison of Section 6.5 to Section 11, which outlines the rights of the parties after termination of the PRLA, in an attempt to show that allowing DePuy to challenge the validity of the '710 patent after abandoning prosecution, maintenance, and enforcement under Section 6.5 would be inconsistent with the intent of the parties, expressed through Section 11, to require cooperation in defense of the '710 patent even if the PRLA were terminated. Additionally, the Hospital argues that in exchange for the unique right to prosecute or control the Patent Applications, DePuy contractually bound itself to help

obtain, maintain, and enforce the application or the patent should DePuy opt to give up control under Section 6.5.

As demonstrated below, however, the Court need not reach any conclusion as to whether Section 6.5 actually includes a no-challenge provision. Even assuming that the last sentence is a no-challenge provision, the Hospital has not established any public policy that overcomes the strong public interest in protecting the free flow of ideas by controlling the monopolies awarded through patents. In other words, the Hospital cannot overcome the dictates of *Lear* no matter the interpretation of the alleged no-challenge clause. In fact, the Hospital's attempt to distinguish *Lear* by identifying DePuy as an "insider" on the '710 patent actually works against it. The Hospital contends that by intentionally prosecuting the Patent Application for several years, DePuy, unlike the manufacturer in *Lear*, gained inside knowledge as to the Patent. DePuy questions its "insider" status in light of the open and public nature of patent prosecution proceedings. DePuy's ultimate status as an insider aside, the Court in *Lear* emphasized that licensees, who are essentially insiders to the secrets incorporated into patents, have the most incentive to challenge the validity of patents and should not be estopped from doing so in order to ensure protection of the public's interests expressed in federal patent policy. *Lear*, 395 U.S. at 670 ("Licensees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery.").

In addition, there is no settlement agreement or consent decree at issue here. DePuy never separately owned any of the Patent Rights leaving them nothing to assign. Most convincingly, the plain meaning of the alleged no-challenge provision in the PRLA is less clear and more ambiguous than other no-challenge clauses courts have refused to honor. *See, e.g.*,

*Baseload Energy*, 619 F.3d at 1359, 1363 (finding insufficiently clear language in a settlement agreement, in which each party agreed to "forever release and discharge" the opposing party "from any and all losses, liabilities, claims, expenses, demands and causes of action of every kind and nature," to release any patent claims or defenses); *Mayo Clinic Jacksonville v. Alzheimer's Inst. of Am., Inc.*, 683 F.2d 1291, 1297–98 (M.D. Fla. 2009) (finding that raising an invalidity counterclaim and affirmative defense did not violate a no-challenge clause in which the party agreed "not to initiate or voluntarily participate in . . . any action directed at undermining, invalidating or declaring unenforceable any claims under the Patent Rights . . . .").

The Hospital's infers that DePuy's obligation "to use reasonable efforts to ensure its investigators cooperate fully with OH to enable OH, as needed, to obtain, maintain, or enforce Patent Rights" equates with an obligation not to challenge the related patents. Yet the Hospital's interpretation does not clearly and unambiguously follow from the plain language of Section 6.5. DePuy agreed only to make a reasonable attempt to encourage investigators to help the Hospital. Nothing clearly and unambiguously requires DePuy to obtain, maintain, or enforce Patent Rights. In fact, those are the exact obligations Section 6.5 allowed DePuy to abandon. Moreover, nothing in Section 6.5 explicitly precludes DePuy from challenging the validity of related patents.

Therefore, like the Court in *Lear*, this Court is left to assess whether contract law's interest in enforcing parties' agreements—in this case the PRLA— outweighs the public's interest in "favoring free competition in ideas which do not merit patent protection" as protected by the ability of licensees to challenge a patent's validity. *See Lear*, 395 U.S.at 656, 668. This is the precise question *Lear* addressed and its holding is fatal to the Hospital's argument.

14

Presented with nothing to overcome *Lear*, the Court cannot prevent DePuy from challenging the validity of the '710 patent based on Section 6.5 of the PRLA.

> **2.    Principles of judicial estoppel cannot overcome federal patent policy, which supports allowing DePuy to challenge the validity of the '710 patent**.

The Hospital also invokes the doctrine of judicial estoppel to support its request that DePuy be prevented from challenging the validity of the '710 patent. Yet as *Lear* illustrates, federal patent policy necessarily trumps any interests promoted through judicial estoppel. Judicial estoppel "protect[s] the integrity of the judicial process . . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Jarrard v. CDI Telecommunications, Inc.*, 408 F.3d 905, 914 (7th Cir. 2005); *see also Levinson v. United States*, 969 F.2d 260, 264 (7th Cir. 1992) ("It is intended to protect the courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories."). Judicial estoppel is also "applied with caution to avoid impinging on the truthseeking function of the court." *Levinson*, 969 F.2d at 264–65 (internal citations omitted). In considering the applicability of judicial estoppel, courts consider (1) whether the party's later position was clearly inconsistent with its earlier position; (2) whether the party's earlier position actually persuaded the earlier court; and (3) whether the party's success with its second, contrary position would create any unfair advantage or detriment. *Jarrard*, 408 F.3d at 914–15 (citing *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001).

In considering the judicial estoppel analysis proposed by the Hospital, potential disputes of material fact that might affect the outcome of the Hospital's motion for partial summary judgment would surface. The parties dispute the extent of DePuy's control over the prosecution

of the 110 Patent Applications; whether DePuy prevailed on the arguments it presented to the PTO while prosecuting the Patent Applications; and the extent of any detriment to the Hospital should DePuy succeed in invalidating the '710 patent. Yet regardless of the outcome on any of these factual questions, the public remains dependent on licensees, or "insiders," to ensure that patents are properly granted. *See Lear*, 395 U.S. at 670. Indeed, allowing licensees to challenge the validity of patents protects the delicate balance between the public's interests in fostering innovation through the monopolies offered in patents and in ensuring the free flow of ideas for the common good. *Id*. at 668.

Moreover, the statutory scheme behind patents provides for one-sided patent prosecutions before the PTO, making validity challenges reasonable exercises necessary to give full effect to federal patent policies. *See id.* Judicial estoppel, on the other hand, seeks to protect the judicial process as it reaches final judgments resulting from adversarial litigation between opposing parties. The lack of adversarial opponents to patent seekers in patent prosecutions brings into question whether the policies at risk in ordinary litigation, which justify implementing judicial estoppel, can even be present in patent prosecution. Arguably then, patent validity challenges become the court's way of protecting the patent prosecution process and preserving its integrity. Consequently, this Court finds that federal policy favoring patent validity challenges outweighs the policies behind judicial estoppel regardless of the parties' factual disputes.

In summary, *Lear* controls. The Hospital's arguments to the contrary have not persuaded the Court that the federal patent policy announced in *Lear*, and applied faithfully by courts including the Federal Circuit ever since, is overcome by any contractual provision in the PRLA

16

or any equitable considerations espoused by the doctrine of judicial estoppel. Additionally, any

exceptions to the *Lear* holding recognized by the Federal Circuit are not applicable here.

Therefore, this Court refuses to prevent DePuy from challenging the validity of the '710 patent.

### D. DePuy's Motion for Partial Summary Judgment, Doc. No. 81

In its motion for partial summary judgment, DePuy asks the Court to determine its rights

and obligations under the PRLA. Specifically, DePuy seeks a declaration from the Court that it

"properly exercised its option rights under Section 6.5 of the [PRLA] and that it has no "ongoing

obligation to pay royalties under" the PRLA. Doc. No. 81 at 1. Section 6.5 of the PRLA

provides:

> Notwithstanding any other provision of this Agreement to the contrary, DEPUY
> and its selected legal counsel shall not abandon the prosecution of the Patent
> Applications or the maintenance or enforcement of the Patents without 60 days
> prior written notice to OH. In any such case, OH shall have the opportunity to
> prosecute the Patent Applications or maintain or enforce the Patents in its own
> name at its own expense, and thereafter any such Patent Applications or Patents
> shall be the sole property of OH and not subject to this Agreement. In such case,
> DEPUY shall use reasonable efforts to ensure its investigators cooperate fully
> with OH to enable OH, as needed, to obtain, maintain, or enforce Patent Rights.

Doc. No. 78-1 at 7.

DePuy's requests implicitly raise the parties' dispute as to whether the PRLA lapsed on

March 1, 2006, under Section 10.1 of the Agreement as DePuy suggested initially in the Cutshall

Letter. Section 10.1 states:

> The term of this Agreement shall expire on the later of 7 years from the Effective
> Date or the expiration of the last applicable Patent unless earlier terminated based
> on the following provisions:
>
> > (a) DEPUY or OH may terminate this Agreement immediately upon
> > written notice if the other party is in material breach of this
> > Agreement and remains so for sixty days after notice of any such
> > breach by the non-breaching party;

<div style="margin-left: 2em;">

(b)     DEPUY may terminate this Agreement immediately upon written notice at any time after the expiration of the 36th month of this Agreement; and

(c)     OH may terminate this Agreement or convert the exclusive license provided in this Agreement to a non-exclusive license, at any time immediately upon written notice if DEPUY is not commercially selling Products by the end of the 7th year of this Agreement.

</div>

Doc. No. 78-1 at 10–11.  The Hospital rejects the idea of lapse contending that the Agreement remained in effect at least until the time of the key 2012 letters.  Alternatively, the Hospital relies on the existence of an implied contract in light of both parties' compliance with the terms of the PRLA through February 2012.  On the other hand, DePuy argues that the PRLA expired in 2006 and disputes the existence of an implied contract.  Neither party, however, seems to believe that the Court must resolve the lapse dispute in order to resolve the questions presented in DePuy's instant motion for partial summary judgment.  Therefore, the Court will leave this dispute for another day and turn to DePuy's requests related to Section 6.5 of the Agreement.

        **1.**       **No genuine dispute of material fact exists as to whether DePuy properly exercised its option under Section 6.5 of the PRLA to abandon prosecution of the 110-related Patent Applications.**

DePuy argues that it properly abandoned the prosecution of Patent Applications related to the 110 cases, as allowed under Section 6.5, by providing the Hospital with notice of the abandonment through the Cutshall Letter in February 2012, or at the very latest, with the Tomko Letter sent to the Hospital on September 28, 2012.  The Hospital disputes DePuy's contention that the Cutshall Letter constituted proper abandonment under Section 6.5.  The Hospital argues that only the Tomko Letter constituted proper abandonment under Section 6.5.  The Hospital rejects the Cutshall Letter as proper notice of Section 6.5 abandonment because the letter only

states that DePuy will cease funding patent prosecution in the context of Section 10.1 expiration of the PRLA, without specifically citing or invoking Section 6.5.

Despite disagreeing about which letter constituted the requisite written notice, both parties agreed at oral argument that DePuy exercised its Section 6.5 option to abandon the prosecution of the 110-related Patent Applications no later than September 2012 with the Tomko Letter. Determining the effect of DePuy's Section 6.5 abandonment does not require a definitive conclusion as to when exactly DePuy provided its written notice of abandonment, just that it did. No doubt the Court will need to ascertain the exact date of the notice should there be a finding of liability at some later point in this litigation so that an accurate calculation of damages can be made. However, the calculation of damages is not currently before the Court and need not be addressed now. Therefore, because the parties agree that DePuy properly exercised its Section 6.5 option to abandon prosecution of the 110-related Patent Applications, there is no genuine dispute of material fact and DePuy is entitled to summary judgment on this single issue. The Court turns its attention next to determining the effect of DePuy's Section 6.5 abandonment on its ongoing obligations to support any 110-related patents and to pay royalties to the Hospital.

> 2. **A genuine dispute of material fact exists as to the effect of DePuy's Section 6.5 abandonment on royalties.**

DePuy contends that all of its obligations under the PRLA related to the 110 cases, including maintenance or enforcement of any of the Hospital's 110-related Patent Rights and payment of royalties for any Products developed using the technology reflected in the 110 cases, ended when it invoked Section 6.5 to opt-out of prosecuting the 110-related Patent Applications. The Hospital disagrees vehemently arguing that DePuy's Section 6.5 abandonment did not, and could not, relieve DePuy of either its obligation to assist the Hospital in obtaining, maintaining,

19

or enforcing its Patent Rights[1] related to the 110 cases or its obligation to pay royalties to the Hospital for the sale of any Products, including AOX.

As a preliminary matter, the Court will not and need not decide at this time whether DePuy's AOX product constituted a "Product" under Section 1.9 of the PRLA, and therefore subject to royalties. The parties' briefs suggest that they disagree as to whether DePuy's AOX product incorporated 110-related technology and consequently whether it was a Product subject to royalties. If the Court ultimately finds that Section 6.5 did not end DePuy's royalty obligations, resolution of the parties' dispute on whether AOX is a Product could affect the amount of royalties DePuy owes the Hospital, if any. However, DePuy has only asked the Court to reach a conclusion as to whether all royalties ended with its Section 6.5 abandonment in the instant motion for partial summary judgment. That question is not dependent on whether AOX qualifies as a Product. Therefore, the Court limits its analysis here to whether the PRLA clearly and unambiguously ended DePuy's royalty obligations on Products when it exercised its Section 6.5 abandonment option.

The effect of DePuy having exercised its option rights under Section 6.5 is dependant upon the interpretation of the (1) "no longer subject to the Agreement" language found in the second sentence of Section 6.5, (2) the definition of "Products" in Section 1.9, and (3) any provision in the PRLA regarding termination of a manufactured item's status as a "Product."

---

[1]Section 1.7 of the PRLA defines "Patent Rights" as "the Patent Applications plus the Patent(s), and the reissues, reexaminations, and extensions thereof." Doc. No. 78-1 at 3. Section 1.6 defines "Patent Applications" as "patent applications filed to protect Hospital Intellectual Property or Joint Intellectual Property (as defined in Section 6(a) of the Research Agreement) which applications shall be listed in Exhibit 1.6 and updated from time to time to include such patent applications' continuations, divisions, and continuations-in-part, and any corresponding foreign applications thereof." *Id.* Notably, Exhibit 1.6 of the PRLA is blank. Nevertheless, the parties agree that patent applications related to the 110 cases constitute Patent Applications for which Patent Rights attach.

Both parties assert confidently that the language of the PRLA on these issues is clear and unambiguous despite reaching conclusions that are diametrically opposed.

DePuy's position grows out of language in the second sentence of Section 6.5, which states that after DePuy provides written notice informing the Hospital of its intent to abandon its obligation to prosecute the Patent Applications or its obligation to maintain or enforce the Patents, "any such Patent Applications or Patents shall be the sole property of OH and not subject to this Agreement." Doc. No. 78-1 at 7. DePuy essentially contends that the "not subject to this Agreement" language clearly and unambiguously results from certain assumptions and leads to unequivocal inferences that support its conclusion that any royalty obligations arising from the use of claims related to the 110 cases ended with its Section 6.5 abandonment of the 110-related Patent Applications. Importantly, the Hospital agrees with many of DePuy's assumptions and inferences.

First, the parties agree that the license grant and royalty obligations set forth in the PRLA are tied to "Products." Second, the parties agree that the term "Products" is defined in relation to the terms "Patents" and "Patent Applications" under Section 1.9 of the PRLA. Section 1.9 defines "Products" as

> items covered by claims, or made or used according to the methods described by claims, in the Patent Applications or in the Patent(s).

Doc. No. 78-1 at 4. Third, the parties agree that Section 6.5 provides DePuy with an option to abandon, or stop funding, the prosecution of Patent Applications. Fourth, the Hospital agrees with DePuy that the "no longer subject to the Agreement" language of Section 6.5 means that the Hospital now owns the 110 Patent Applications and any resulting Patents, including the '710 Patent, because of DePuy's Section 6.5 abandonment. Fifth, the Hospital even agrees that the

110 Patent Applications and resulting Patents are "no longer subject to the Agreement." At this point, however, the parties' interpretation of the meaning of PRLA's provisions diverges.

### a.      DePuy's Interpretation

DePuy argues that the clear and unambiguous inference from the Section 6.5 language is because the 110 Patent Applications and Patents are "no longer subject to the Agreement" as a whole and because "Products" are defined by "Patent Applications" and "Patents," any manufactured items incorporating claims from the110 Patent Applications and Patents no longer qualify, or lose their status, as "Products" under the PRLA. DePuy then takes the next inferential step and concludes that if an item no longer constitutes a "Product," it cannot be subject to royalties based on its sales because royalties are only paid on "Products" under Section 3.1(a), which provides that:

> DEPUY shall pay OH a royalty on Net Sales, beginning with the first commercial sale of any Products, for the longer of seven years or the life of an issued Patent, as follows:
>
> (1)     Net Sales prior to issuance of Patent(s) with claims covering Products or methods for making or using Products: 3.0%; and
> (2)     Net Sales after issuance of Patent(s) with claims covering Products or methods for making or using Products: 6.0% (such 6.0% payments then being made retroactive to all Net Sales).

Doc. No. 78-1 at 4.

Review of the Section 1.9 and Section 6.5 language shows that DePuy's conclusion that an item's status as a Product ends upon abandonment is merely an inference as there is no direct language in either section describing when, if, or how an item might lose its status as a Product. DePuy argues that its inference is consistent with the intent of the parties when drafting the PRLA as evidenced by other provisions in the PRLA. Specifically, DePuy points to Section 11

of the PRLA in which the parties defined rights remaining after termination of the PRLA. DePuy admits that Section 11.1(b) provides for an ongoing license and ongoing royalty obligations if the PRLA were ever terminated. As such, DePuy is convinced that the parties knew how to require ongoing royalties when that was their intent. But Section 6.5 abandonment, DePuy reasons, does not terminate the entire PRLA; therefore, the ongoing obligations provided for in Section 11 do not apply in the case of Section 6.5 abandonment. Instead, DePuy concludes that Section 6.5 abandonment ends the license and any royalty obligations related only to the specifically abandoned Patent Applications and Patents. All other aspects of the PRLA remain in effect.

The Court finds DePuy's inferences based on the language of the PRLA are reasonable and that its conclusions about the effects of its Section 6.5 abandonment are also reasonable. The question, however, is not whether DePuy's interpretation of the PRLA is reasonable, but whether the PRLA is clear and unambiguous as to the parties' intent regarding the effects of Section 6.5 abandonment. If the language of a contract is clear and unambiguous, the court must give the contract's language its plain and ordinary meaning as a matter of law without considering any extrinsic evidence. *USA Life One Ins. Co.*, 682 N.E.2d at 538; *Barclay*, 816 N.E.2d at 975. Yet, "a contract is ambiguous . . . if reasonable persons would differ as the meaning of its terms." *IP of A W. 86th St. 1, LLC*, 686 F.3d at 367–68; *see also Beam*, 765 N.E.2d at 528. And the problem here is that the Hospital presents equally reasonable inferences leading to a completely opposite conclusion as to how the PRLA defines DePuy's remaining royalty obligations after invoking Section 6.5.

### b. The Hospital's Interpretation

The Hospital's allegedly clear and unambiguous interpretation of the "no longer subject to the Agreement" language of Section 6.5 starts with attention to the language of Section 2.1 granting the license. Section 2.1 states that the "exclusive license also includes all know-how and technology related to Products that OH owns." Doc. No. 78-1 at 4. The Hospital uses Section 2.1 to support its contention that while "Products" are defined in relation to "Patent Applications" and "Patents," a manufactured item never loses its status as a Product once it qualifies initially for that status. Specifically, the Hospital contends that the Section 2.1 license, for which earned royalties defined in Section 3.1(a) serve as consideration, extends beyond the claims identified in Patent Applications and Patents to related know-how and technology. As such, the Hospital reasons that even if the Patent Applications and Patents are no longer subject to the PRLA after Section 6.5 abandonment, manufactured items incorporating any of the Hospital's related know-how or technology, or anything described in a Patent Application, are still subject to the license and accompanying royalty obligations established in Section 2.1 and Section 3.1(a). The Hospital argues that this is the clear and unambiguous interpretation of the PRLA because, among other things, DePuy's interpretation that Products lose their status as Products upon abandonment leads to an absurd result whereby DePuy could continue using the Hospital's unpatented know-how and technology without compensating it accordingly.

Each party presents the prospect of other absurd results in the attempt to show that the PRLA clearly and unambiguously supports its interpretation of the effects of DePuy's Section 6.5 abandonment on its obligation to pay royalties. Yet the Court is persuaded that a genuine dispute of material fact exists as to the parties intentions related to continuing royalty obligations following Section 6.5 abandonment. None of the pertinent sections of the PRLA address when,

if ever, a Product loses its status as Product.  Section 6.5 says nothing about the effect of abandonment on the Hospital's licensed know-how and technology.  Without clear explanation of these key issues, the parties have reached reasonable, although competing, conclusions based on reasonable assumptions and inferences as to the full effect of Section 6.5 abandonment.

As such, the intent of the parties upon Section 6.5 abandonment is ambiguous in that it simply is not clear what the intention of the parties was with respect to the continuing obligation to pay royalties on Products concerning Patent Applications DePuy has abandoned under Section 6.5.  It could well be that both parties assumed different results as they now argue or simply did not envision the circumstances presented now when they drafted and signed the PRLA.  But what is clear is that the PRLA is silent as to the realities the parties now face and both parties have advanced reasonable, but opposite, interpretations of the PRLA's intent.  As a result, the Court must conclude that Section 6.5 is ambiguous necessitating further development of the record, including extrinsic evidence.

Therefore, the Court can only grant DePuy's motion for summary in part concluding that it properly exercised its Section 6.5 right to abandon prosecution of the 110-related Patent Applications.  The Court must deny DePuy's motion as to its continuing royalty obligations.

## III.    CONCLUSION

For the reasons stated above, the Court **DENIES** the Hospital's motion for partial summary judgment.  [Doc. No. 75].  DePuy's affirmative defense and counterclaim alleging the invalidity of the '710 patent are not stricken.

In addition, the Court **GRANTS IN PART** and **DENIES IN PART** DePuy's motion for partial summary judgment. [Doc. No. 81].  The Court grants the first part of DePuy's motion and

declares that DePuy properly exercised its right to abandon prosecution of the 110-related Patent

Applications pursuant to Section 6.5 of the PRLA.  However, the Court denies the second part of

DePuy's motion.  The PRLA is ambiguous as to the effect of DePuy's Section 6.5 abandonment

on its royalty obligations creating a genuine dispute of material fact as to the intent of the parties

regarding DePuy's continuing obligation to pay royalties following its Section 6.5 abandonment.

The Court now **SETS** a Telephonic Status Conference for **March 24, 2015**, at **3:00 p.m.**

**(E.D.T.)** to discuss the remaining issues in this consolidated case and establish case management

deadlines.  The Court will call all counsel listed on the docket sheet unless notified that specified

attorneys need not be contacted.  If, at the time of the scheduled conference, you will not be at

the telephone number identified on the docket please contact chambers.  The Court **ORDERS**

the parties to submit a joint status report by **March 17, 2015**, describing the status of this case in

light of this decision.

**SO ORDERED.**

Dated this 13th day of February, 2015.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge