# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| DEPUY ORTHOPAEDICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:12-CV-299-JVB-MGG |
| | ) | |
| ORTHOPAEDIC HOSPITAL, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

This consolidated action stems from both contractual and patent-related disputes between Plaintiff DePuy Orthopaedics, Inc. ("DePuy"), an Indiana medical device manufacturer, and Orthopaedic Hospital ("the Hospital"), a California research hospital. DePuy and the Hospital's formal relationship began on March 1, 1999, when they executed a Research Agreement [DE 238-3] and a Patent Rights and License Agreement ("PRLA") [DE 238-1] to govern their work together developing technology and products related to polyethylene orthopaedic implants. Under the PRLA, DePuy agreed to assume financial responsibility for prosecuting, maintaining, and enforcing related patent rights; to develop and market products that used any of the new technology; and to pay the Hospital royalties on any net sales of products incorporating the new technology. In return, the parties agreed that the Hospital would retain ownership of any patents arising from the technology. In addition, DePuy was granted an exclusive license to use the technology before and after it was patented.

The parties' work together resulted in multiple patent applications and five patents related to polyethylene orthopaedic implants ("the 110 Family"), all of which share a similar if not identical specification. Before the Court in this litigation are infringement and invalidity

contentions related to the 110 Family Patents as well as a breach of contract claim related to the royalties provision of the PRLA.  In February 2015, this Court issued its order addressing some contractual issues raised in motions for partial summary judgment by each party.  [DE 108].  In January 2016, this Court issued a claim construction order pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996) regarding certain patent claims in 110 Family Patents. [DE 163].  The deadline for the close of all discovery passed on August 31, 2016, and the parties timely filed four motions for summary judgment, five *Daubert* motions to exclude expert evidence, and two motions to strike argument and evidence.

On December 8, 2016, all four motions for summary judgment [DE 236, 241, 243, 251] and one motion to strike [DE 305] were referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and N.D. Ind. L.R. 72-1.  [DE 342].  A second motion to strike [DE 256] was already before the undersigned given its nondispositive character.  On May 3, 2017, the undersigned held oral argument on all six motions and now issues the following Report and Recommendation.

## I.    OVERARCHING RELEVANT BACKGROUND

The following facts, and those reported in the context of particular motions below, are primarily not in dispute.  Where the facts are in dispute, the undersigned has determined that the disputes are either not material or has chosen to address such disputes in the substantive analysis of the issues.

### A.    History of the Parties' Relationship

The parties' entered their Research Agreement and PRLA in 1999 based on their unique but related interests in the development of wear-resistant and oxidation-resistant ultra-high molecular weight polyethylene ("UHMWPE") used to make orthopaedic implants.  The Hospital

contributed human capital, which had the scientific expertise to develop innovative, relevant,

patentable technology.  DePuy contributed resources in support of the research and patent

prosecution based on its interest in manufacturing and selling improved implants.  The parties

knew the field was ripe for innovation and an exclusive license for DePuy to manufacture and

sell any new technology promised mutual success.

      In 1999, orthopaedic implants continued to suffer from problems arising from the

technology used to produce them.  When inserted into a human body, the polyethylene implants

would wear, releasing microscopic polyethylene particles that would eat away bone near the

implant.  In response, persons of ordinary skill in the art ("POSAs") started irradiating the

implants to cause crosslinking within the polyethylene and improve the implant's wear-

resistance.  However, radiation broke down the chemical bonds in the polyethylene creating free

radicals that led to oxidation, which also caused wear and fracture of the implants.  POSAs then

turned their attention toward reducing or eliminating oxidation through irradiation of implants in

vacuum-sealed packaging, which prevented pre-implantation oxidation but not post-implantation

oxidation.  POSAs then started applying heat, or thermal treatments, to improve oxidation

resistance of implants.  Such thermal treatments included remelting, or heating the implant above

its melt temperature, and annealing, or heating the implant below its melt temperature.  These

types of heat treatments, however, still weakened the implants leading the Hospital to conduct

research directed toward creating oxidation-resistant implants without remelting or annealing.

      The Hospital's research led to the first 110 Family Patent Applications in 2001.  DePuy

prosecuted the 110 Family Applications pursuant to the terms of PRLA from 2001 until 2012

when it abandoned its obligations under the PRLA to prosecute and defend the Applications and

any resulting patents.  None of the 110 Family Applications had issued as patents before DePuy

stopped prosecuting the Applications.  The Hospital, however, continued the patent prosecution process.  The Examiner at the U.S. Patent and Trademark Office ("USPTO") continued to reject the 110 Family Applications until the Hospital amended the Applications to replace the claim term "without remelting or annealing" with the term "without thermally treating the implant to extinguish free radicals."

The first 110 Family Patent issued was U.S. Patent No. 8,658,710 ("the '710 Patent"), on February 25, 2014.  U.S. Patent No. 8,796,347 ("the '347 Patent") issued on August 5, 2014, followed by U.S. Patent No. 9,155,817 ("the '817 Patent") on October 13, 2015; U.S. Patent No. 9,242,025 ("the '025 Patent") on January 26, 2016; and U.S. Patent No. 9,302,028 ("the '028 Patent") on April 5, 2016.  All of the 110 Family Patents are directed to a method for making a wear-resistant and oxidation-resistant polyethylene orthopaedic implants without thermally treating them to extinguish free radicals.

Before any of the 110 Family Patents issued, however, DePuy began selling artificial knee systems made from a polyethylene product it manufactured called AOX.  The AOX knee systems became commercially available for sale between December 2011 and February 2012.  In communications with DePuy in early 2012, the Hospital informed DePuy of its belief that AOX was made using technology from the 110 Family Applications and that based on the terms of the PRLA, DePuy owed it royalties for any AOX sales.

Disagreeing with the Hospital's conclusion that AOX was covered by the 110 Family Applications, DePuy filed its complaint in this Court on June 11, 2012, seeking a declaratory judgment as to its rights and obligations under the PRLA.  On December 28, 2012, the Hospital then filed its complaint alleging, as relevant here, that DePuy breached the PRLA by failing to pay royalties on AOX sales.  In February 2014, the Hospital filed another complaint alleging that

AOX infringed the newly issued '710 Patent.  In response, DePuy challenged the validity of the 110 Family Patents through an affirmative defense and a petition for *inter partes* review of claims 1–16 of the '710 Patent before the USPTO's Patent Trial and Appeal Board ("PTAB").  The PTAB denied DePuy's petition on July 16, 2015 [DE 174-10], and its invalidity affirmative defense remains part of this case.

### B.   Previous Decisions in this Consolidated Action

Among the Court's earliest substantive decisions in this case was its order dated February 13, 2015, granting in part and denying in part DePuy's motion for partial summary judgment.  As relevant here, the Court granted summary judgment in part to DePuy "declar[ing] that DePuy properly exercised its right to abandon prosecution of the 110-related Patent Applications pursuant to Section 6.5 of the PRLA."  [DE 108 at 26].  However, the Court declined to decide exactly when DePuy effected its Section 6.5 abandonment.  The Court also denied summary judgment in part based upon "a genuine dispute of material fact as to the intent of the parties regarding DePuy's continuing obligation to pay royalties following its Section 6.5 abandonment."  [*Id.*].  The Court declined to reach any decision on the parties' dispute over whether the PRLA lapsed in March 2006 under its termination clause in Section 10.1.

On January 8, 2016, the Court issued its *Markman* claim construction order in which the Court rejected DePuy's argument that the claim term "without thermally treating the implant to extinguish free radicals" ("the Thermal Treatment Limitation") in the 110 Family Patents was indefinite.[1]  [DE 163 at 23–31].  The Court found that "the plain and ordinary meaning of [the Thermal Treatment Limitation] was understood by [POSAs] at the time of the patent application

---

[1] Only the '710 and '347 Patents were at issue in the January 2016 *Markman* order.  However, all the 110 Family Patents, including the '817 Patent at issue in the instant motions for summary judgment, teach the Thermal Treatment Limitation.

in the context of the claim language itself" and held that "the plain and ordinary meaning of the [Thermal Treatment Limitation] will apply in this litigation going forward." [*Id.* at 32–33]. The Court did not construe the claim term "highly resistant to oxidation" ("the Highly Resistant Limitation") because it was not incorporated into any issued patent at the time of the parties' claim construction briefing or the related hearing before this Court. [*Id.* at 13]. The Highly Resistant Limitation was later part of the '817 Patent.

### C.    Current Procedural Posture

Two of DePuy's instant motions seek summary judgment that the '710 and '817 patents are invalid under 35 U.S.C. § 102 or 35 U.S.C. § 103. [DE 241, 243]. Specifically, DePuy argues that U.S. Patent No. 5,577,368 ("the Hamilton Patent" or "Hamilton") and U.S. Patent No. 6,794,423 ("the Li Patent" or "Li") each anticipates the '817 Patent. DePuy also contends that Hamilton and Li, each in view of Japanese Laid-Open Patent Application No. 11-239611 ("the Tomita Publication" or "Tomita") and International Publication No. WO 98/01085 ("the Shen Publication" or "Shen"), render the '710 Patent obvious. DePuy also argues that Li in view of Shen renders the '817 Patent obvious.

Through another motion, DePuy seeks summary judgment that its AOX products and process do not infringe any of the asserted claims in the Hospital's 110 Family Patents. [DE 251]. In support, DePuy contends that AOX is made using a thermal treatment prohibited by the patents-in-suit such that it is not covered and cannot infringe. DePuy's non-infringement arguments are premised upon the validity of the patents-in-suit. Should the Court grant summary judgment to DePuy finding the patents invalid, the instant motion for summary judgment for non-infringement would be moot.

In its last motion for summary judgment, DePuy asks the Court to resolve two contractual issues related to the PRLA. [DE 236]. DePuy seeks declaration (1) that the PRLA expired on March 1, 2006, based on its Section 10.1 Term and Termination provision; and (2) that it does not owe the Hospital royalties under the PRLA because it abandoned prosecution of the 110 Family Patents under Section 6.5 of the PRLA. The PRLA's royalty provision requires DePuy to pay royalties on technology covered by both the 110 Family Applications and Patents. As a result, these contract issues must be resolved regardless of whether the patents-at-issue remain valid and whether AOX infringes.

Before turning to DePuy's motions for summary judgment, however, the undersigned will first address the Hospital's motions to strike expert evidence. [DE 256; 305].

## II.    MOTIONS TO STRIKE

Through its first motion to strike [DE 256], the Hospital seeks exclusion of opinions related to DePuy's obviousness contentions from its expert Dr. Stephen H. Spiegelberg. The Hospital contends that Dr. Spiegelberg's opinions fail to comply with Fed. R. Civ. P. 26(a)(2)'s requirement that expert witness reports "must contain a complete statement of all opinions the witness will express and the basis and reasons for them."

Through its second motion to strike [DE 305], the Hospital asks the Court to strike DePuy's motion for summary judgment regarding Section 6.5 of the PRLA as an improper motion for reconsideration of an issue that was fully litigated and decided by this Court in its order dated February 13, 2015. In addition, the Hospitals asks the Court to strike the following statements and opinions from four DePuy experts. First, the Hospital challenges the Declaration of Mark D. Hanes arguing that it does not "set out facts that would be admissible in evidence as required by Fed. R. Civ. P. 56(c)(4). Second, the Hospital argues that the Declaration of Dr.

7

Cheryl R. Blanchard includes new expert opinions that were not timely disclosed in her expert report as required by Fed. R. Civ. P. 26(a)(2). Third, the Hospital similarly asserts that the Declaration of John R. Logar presents untimely new expert opinions. Fourth, the Hospital contends that the Declarations of Dr. Spiegelberg are unacceptable unsworn statements under Fed. R. Civ. P. 56(e) that also disclose evidence not previously disclosed as required under Fed. R. Civ. P. 26(a)(2).

These motions reflect the Hospital's apparent concern that it will be prejudiced in the Court's summary judgment analysis if these arguments, expert opinions, and declarations are not stricken. As discussed below, however, the undersigned has concluded that DePuy is not entitled to summary judgment on any of its four motions even after considering all of the challenged evidence. Therefore, the undersigned **RECOMMENDS** that the Court **DENY WITHOUT PREJUDICE** the Hospital's motions to strike. [DE 256, 305]. Accordingly, the Hospital should be allowed to file motions in limine at a later date in anticipation of trial, as necessary.

## III.    MOTIONS FOR SUMMARY JUDGMENT

### A.    Summary Judgment Standard

"Summary judgment is as appropriate in a patent case as it is in any other case." *Desper Prods., Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1332 (Fed. Cir. 1998). Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it will affect the outcome of a lawsuit, and a dispute over a material fact is "genuine" only if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In considering the record, the Court must view all underlying facts and reasonable inferences in the light most favorable to the nonmoving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The nonmoving party need not conclusively resolve the case in its favor; "rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)).

However, if the non-moving party fails to present a genuine issue of material fact, the Court must grant summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). "Mere denials or conclusory statements are insufficient" to survive summary judgment. *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 836 (Fed. Cir. 1984). Where a factual record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In other words, "[s]ummary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted).

### B.    Patent Issues

Preliminarily, resolution of patent issues rely upon the perspective of a POSA—a person of ordinary skill in the art—at the time of the patent application. In this case, DePuy defines the applicable POSA based on the opinion of the Hospital's expert, Dr. Noble, noting that its own expert's opinion is not materially different. [*Compare* DE 246-1 at 4, ¶ 19 (Dr. Noble), *with* DE 245-9 at 6, ¶ 17 (Dr. Spiegelberg)]. Accordingly, a POSA for purposes of the instant motions is

an individual with "either: (1) a Bachelor's Degree in Chemical Engineering, Mechanical Engineering, Biomedical Engineering, Materials Science and Engineering, or another related field of science, *e.g.*, polymer science, as well as a number of years of related work experience in the field of polymeric artificial orthopaedic implants; or (2) an advanced degree in Chemical Engineering, Mechanical Engineering, Biomedical Engineering, Materials Science and Engineering, or another related field of science, *e.g.*, polymer science, as well as some related work experience in the field of polymeric artificial orthopaedic implants."  [DE 242 at 14–15 (citing DE 246-1 at 4, ¶ 19)].

### 1.    Invalidity

In its instant motions for summary judgment, DePuy alleges that the '710 and '817 patents are invalid as a matter of law for several reasons.  [DE 241, 243].  First, DePuy argues that Claims 1–3, 5, and 10–12 in the '817 are invalid because they are anticipated by either the Hamilton or Li Patent.  Second, DePuy argues that Claims 1–4 and 6–15 of the '710 Patent are rendered obvious, and therefore invalid, by both the Hamilton and Li Patents in view of the Tomita and Shen Publications.  Additionally, DePuy contends that Claims 10–12 of the '817 Patent are rendered obvious and invalid by the Li Patent in view of the Shen Publication.

While patent claims are presumed to be valid, this presumption is rebuttable because "[p]ublic policy requires that only inventions which fully meet the statutory standards are entitled to patents [and] is furthered when the validity of a patent, which was originally obtained *in ex parte* proceedings in the PTO, can be challenged in court."  *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1564 (Fed. Cir. 1988).  To succeed, a party challenging the validity of a patent must establish invalidity by clear and convincing evidence.  *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011).

Notably, the Hospital has not challenged DePuy's contentions that Claims 2–3, 5, and 10–12 are anticipated or obvious under Hamilton or Li.  The Hospital only challenges claim terms set forth in Claim 1 of the '710 and '817 Patents.  Therefore, the undersigned only recites Claim 1 of each patent below for context along with the relevant prior art references.  The relevant claim terms at issue are boldfaced.

### a.     Relevant Patent Claim Terms at Issue

### '817 Patent

1.     A method for producing a wear-resistant and **oxidation-resistant medical implant** of a joint prosthesis, said method comprising the steps of:

     (I)     providing an oxidation-resistant medical implant of a joint prosthesis comprising a polyethylene component; and

     (II)    irradiating the oxidation-resistant medical implant at a radiation dose of above 5 Mrads so as to crosslink the implant thereby improving its wear resistance, **without thermally treating the implant to extinguish free radicals** in the irradiated and crosslinked implant during or subsequent to irradiating the oxidation-resistant implant, **wherein the oxidation-resistant is highly resistant to oxidation** caused by free radicals generated by the irradiation of step (II).

[DE 245-1 at 13, 16:47–61 (emphasis added)].

### '710 Patent

1.     A method for producing a wear-resistant and **oxidation-resistant medical implant** of a joint prosthesis, said method comprising the steps of:

     (I)     providing an oxidation-resistant medical implant of a joint prosthesis comprising a polyethylene component; and

     (II)    irradiating the oxidation-resistant medical implant at a radiation dose of above 5 Mrad to about 25 Mrad so as to crosslink the implant thereby improving its wear resistance, **without thermally treating the implant to extinguish free radicals** in the irradiated and crosslinked implant during or subsequent to irradiating the oxidation-resistant implant; wherein **the oxidation-resistant implant** contains an antioxidant rendering it resistant to oxidation

11

caused by free radicals generated by the irradiation of step (II); and
**the irradiated oxidation-resistant implant possesses the
characteristics of**: a degree of swelling of between about 1.7 to
about 3.6; a molecular weight between crosslinks of between about
400 to about 3,500 g/mol; and a gel content of between about 95%
to about 99%.

[DE 245-2 at 12, 16:41–16:61 (emphasis added)].

### b.    Alleged Invalidating References

### The Hamilton Patent

Issued on November 26, 1996, the Hamilton Patent, entitled "Method for Improving

Wear Resistance of Polymeric Bioimplantable Components," qualifies as prior art under 35

U.S.C. § 102.  Hamilton's abstract further describes the invention as follows:

Wear resistance and oxidation resistance of bioimplantable polymeric
parts is improved by packaging the parts within flexible, gas impermeable
containers while subjecting the containers and the parts to a relatively high
vacuum force.  The containers are heat sealed while subjected to the
vacuum force such that, upon sealing, hydrostatic pressure is exerted on
the part. Following sealing of the packages, the packages and their
contents are irradiated to an extent sufficient to sterilize the parts and to
promote crosslinking within the part.  Alternatively, the same property
enhancements can be imparted to polymeric parts by packaging the part
within rigid or flexible containers, minimizing the oxygen content within
the containers, pressurizing the containers with an inert gas, or with a
mixture of hydrogen and an inert gas, to greater than 1.5 atmospheres, and
irradiating the part and the container.

[DE 245-4 at 2].

Hamilton discloses a method for improving the wear-resistance and oxidation-resistance

of the polymer used in UHMWPE implants.  Hamilton discloses that gamma radiation was the

preferred sterilization technique for UHMWPE implants at the time of the invention, but also

notes that the irradiation caused unwanted side effects, including changes in the mechanical

properties of the polymer and the release of free radicals that lead to oxidation.  [*Id.* at 5, 1:34–

45].  From that state of the art, Hamilton aimed to improve wear-resistance and oxidation-

12

resistance by irradiating the implant inside a vacuum sealed package for purposes of sterilization and increased crosslinking.  [*Id.* at 5–6, 2:56–3:22].

### The Li Patent

Issued on September 21, 2004, and filed on July 26, 2000, with priority to a July 1999 provisional application, the Li patent is entitled "Fracture-Resistant, Cross-Linked Ultra High Molecular Weight Polyethylene Shaped Material and Articles Made Therefrom" and qualifies as prior art under 35 U.S.C. § 102.  The Li invention

> is directed to a tough, wear resistant Ultra High Molecular Weight Polyethylene shaped material prepared by the irradiation cross linking (using an irradiation dose higher than 4 Mrads, preferably 5 Mrads, and most preferably less than 10 Mrads of a UHMWPE article which has been shaped by direct compression molding.

[DE 245-7 at 17, 3:7–13].  Li discloses directly molded implants irradiated at doses from 2.5 to 50 Mrads.  [*Id.*, 4:40–46].  Li also discloses that [h]eating the irradiated material to the melting point of UHMWPE is not desirable and can cause deleterious effects . . . .  [*Id.* at 18, 5:60–62].  Li further discloses that "the irradiated material should not be heated above its melting point at any time [and that] no heating after irradiation is required."  [*Id.*, 5:64–67].

### The Tomita Publication

Tomita published on September 7, 1999, and qualifies as prior art under 35 U.S.C. § 102.  Tomita discloses a method for making oxidation-resistant and wear-resistant polyethylene implants by mixing an antioxidant with polyethylene, making an implant from the antioxidant-polyethylene mixture, and then irradiating the implant to crosslink the polyethylene.  [DE 245-5 at 5, [0001]; *Id.* at 7, [0007]; *Id.* at 9, [0013]; *Id.* at 10, [0015] & [0017]; and *Id.* at 12, [0021]].  Tomita explicitly discloses an irradiation dose of "0.5–5 Mrad," but also provides that "[t]here is no particular limitation on [the] dose of irradiation."  [*Id.* at 12, [0021]].

**The Shen Publication**

Shen published on January 15, 1998, and qualifies as prior art under 35 U.S.C. § 102. The Shen application is entitled "Crosslinking of Polyethylene for Low Wear Using Radiation and Thermal Treatments." [DE 245-6 at 2]. Shen "discloses methods for enhancing the wear-resistance of polyethylene implants through irradiation, preferably gamma radiation, and thermal treatments, such as remelting or annealing. [*Id.*, Abstract]. Shen also discloses specific physical characteristics achieved through crosslinking and thermal treatments. [*Id.*].

  c.  **Anticipation**

    i.  **Legal Standard**

A patent claim is invalid as anticipated under 35 U.S.C. § 102 where every element of the claim is disclosed in a single prior art reference. *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003). Anticipation is a question of fact. *See Merck & Co. v. Teva Pharms. USA, Inc.,* 347 F.3d 1367, 1369 (Fed. Cir. 2003).

"[A] prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference." *Id.* An anticipating reference need not use the exact words as the claim. *See In re May,* 574 F.2d 1082, 1090 (C.C.P.A. 1978). In other words, "[c]laimed subject matter is 'anticipated' when it is not new; that is, when it was previously known." *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1082 (Fed. Cir. 2008). Patent claims are invalidated when "every element and limitation of the claim was previously described in a single prior art reference, either expressly or inherently, so as to place a person of ordinary skill in possession of the invention." *Id.* (citing *Schering Corp.,* 339 F.3d at 1379; *Continental Can Co. USA v. Monsanto Co.,* 948 F.2d 1264, 1267–69 (Fed. Cir. 1991)); *see also MEHL/Biophile Int'l Corp. v. Milgraum*, 192

F.3d 1362, 1365 (Fed. Cir. 1999). "An anticipating reference must be enabling; that is, the description must be such that a person of ordinary skill in the field of the invention can practice the subject matter based on the reference, without undue experimentation." *Sanofi-Synthelabo,* 550 F.3d at 1082 (citing *Amgen Inc. v. Hoechst Marion Roussel, Inc.,* 457 F.3d 1293, 1306–07 (Fed. Cir. 2006); *Elan Pharms., Inc. v. Mayo Found. for Med. Educ. & Research,* 346 F.3d 1051, 1054 (Fed. Cir. 2003)).

In the end, "the dispositive question regarding anticipation is whether one skilled in the art would reasonably understand or infer from the prior art reference's teaching that every claim element was disclosed in that single reference." *Dayco Prods., Inc. v. Total Containment, Inc.,* 329 F.3d 1358, 1368 (Fed. Cir. 2003). Summary determination of anticipation is appropriate if the record reveals no genuine dispute of material fact. *Golden Bridge Tech., Inc. v. Nokia, Inc.,* 527 F.3d 1318, 1321 (Fed. Cir. 2008).

### ii.    Analysis

Through the instant motions, DePuy contends that the '817 patent is invalid, as a matter of law, as anticipated independently by Hamilton and Li. The Hospital challenges DePuy's contention that each patent independently discloses all the elements of the asserted claims in the '817 patent alleging genuine disputes of material fact as to Claim 1.[2] Specifically, the Hospital contends that neither Hamilton nor Li disclose "an oxidation-resistant implant" ("the Oxidation

---

[2] In addition, the Hospital suggests through a footnote that Dr. Noble's opinions, as set forth in his Rebuttal Report dated July 18, 2016, create genuine issues of material fact as to whether Hamilton discloses the limitations of "antioxidants, an antioxidant that renders the material oxidation resistant to free radicals generated during irradiation, or any of the claimed ranges of physical properties" set forth in the '817 Patent. [DE 308 at 21 n.9 (citing DE 250-3 at ¶¶ 75–78; 538–88)]. Similarly, the Hospital cites Dr. Noble's opinions as the source of genuine disputes as to whether Li discloses the same three limitations plus "an oxidation resistant or wear resistant medical implant, and teaches away from a radiation dose above 5 Mrad." [DE 310 at 16 n.9 (citing DE 250-3 at ¶¶ 62–67; 463–514)]. The Court need not address these alleged disputes to complete its anticipation analysis because the genuine dispute of material fact as to Claim 1 limitations related to thermal treatments and oxidation resistance discussed *infra* doom DePuy's anticipation arguments.

Resistant Limitation"), the Highly Resistant Limitation ("oxidation-resistant implant that is highly resistant to oxidation"), and the Thermal Treatment Limitation ("without thermally treating to extinguish free radicals").  During the *Markman* process, the Court declined to construe the Thermal Treatment Limitation holding that "the plain and ordinary meaning of the [Thermal Treatment Limitation] will apply in this litigation going forward."  [DE 163 at 22–33].[3] The Highly Resistant Limitation was not analyzed during claim construction because the '817 patent had not issued at that time.  [*Id.* at 13].

Preliminarily, the Hospital argues that the opinions of DePuy's expert, Dr. Stephen Spiegelberg, are inadmissible and irrelevant because they are based on an allegedly incorrect construction of the Thermal Treatment Limitation.  *See Chi. Mercantile Exch., Inc. v. Tech. Research Grp., LLC*, 782 F. Supp. 2d 667, 674–75 (N.D. Ill. 2011) (excluding as irrelevant expert testimony based on an incorrect construction); *see also Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009) ("Once a district court has construed the relevant claim terms, and unless altered by the district court, then that legal determination governs for the purposes of trial.  No party may contradict the court's construction to a jury.").  In addition, the Hospital suggests that two of DePuy's experts present conflicting opinions regarding the Thermal Treatment Limitation that create a genuine issue of material fact and preclude summary judgment.  The Court need not address either of these arguments because summary judgment is not appropriate for other reasons.  Despite DePuy's arguments to the contrary, genuine disputes of material fact exists as to whether either Hamilton or Li discloses the Oxidation Resistance, Highly Resistant, and Thermal Treatment Limitations.

---

[3] The Court's claim construction order considered the Thermal Treatment Limitation as included in the '710 and '347 patents at issue in this case.  However, there is no dispute that the claim construction applies to the '817 patent, which uses the same language for its Thermal Treatment Limitation.

**A]        Hamilton**

In arguing that Hamilton anticipates the Thermal Treatment Limitation, DePuy relies in part on the Declaration of its expert, Dr. Stephen Spiegelberg, who opined that "A POSA reading Hamilton would have understood that no thermal treatment during or after the irradiation of the implant was required when using the Hamilton process."  [DE 245-9 at 12, ¶ 37].  In the same paragraph, Dr. Spiegelberg opined that "Hamilton discloses the limitation of "without treating the implant."  [*Id.*].  Yet, Dr. Spiegelberg also states that Hamilton "does not describe using a thermal treatment to extinguish the free radicals. . . ."  [*Id.*].  Accordingly, DePuy seems to argue that the Thermal Treatment Limitation is inherent in, and therefore disclosed by, Hamilton.

Indeed, a claim need not be explicitly disclosed in the prior art to constitute anticipation if the claim or limitation is inherent in the prior art.  *Sanofi-Synthelabo*, 550 F.3d at 1082; *see also MEHL/Biophile Int'l*, 192 F.3d at 1365.

> Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claimed limitations, it anticipates.  Inherency is not necessarily coterminous with the knowledge of those of ordinary skill in the art.  Artisans of ordinary skill may not recognize the inherent characteristics or functioning of the prior art.

*MEHL/Biophile Int'l*, 192 F.3d at 1365 (internal citations omitted).  Yet here, DePuy's evidence in support of its conclusion that Hamilton inherently includes the Thermal Treatment Limitation is weak.

For instance, DePuy cites the following exchange at the deposition of the Hospital's expert, Dr. Noble.

> Q.        (By [DePuy's counsel])  And is it your understanding that the process described in Hamilton is done without a thermal treatment to extinguish free radicals?
>
> A.        [Dr. Noble]  Yes, that's my understanding.

[DE 246-2 at 21, 207:7–10].  Based on Dr. Noble's testimony, DePuy concludes that the Hospital agrees that a POSA would have understood that no thermal treatment was required when using the Hamilton process.  In other words, DePuy argues that Hamilton's silence as to thermal treatments to extinguish free radicals discloses the Thermal Treatment Limitation, and that Dr. Noble's testimony establishes that no dispute of material fact exists as to that disclosure.

The Hospital, however, rejects DePuy's interpretation of Dr. Noble's testimony and contends that Hamilton's silence on thermal treatments does not disclose the Thermal Treatment Limitation.  The Hospital does not seem to dispute whether Hamilton could have been practiced without a thermal treatment to extinguish free radicals as DePuy contends.  Instead, the Hospital argues that Hamilton could not disclose the Thermal Treatment Limitation because it does not disclose "an oxidation-resistant implant that is highly resistant to oxidation," (*i.e.,* the Oxidation Resistance and Highly Resistant Limitations) allegedly critical predicates in the '817 patent.  In reaching this conclusion, the Hospital challenges DePuy's assertion that Hamilton's disclosure of methods to improve oxidation-resistance equate to oxidation-resistance.

In support, the Hospital directs the Court's attention to the '710 Patent's specification, which states that "many studies have shown that oxidation due to open-air gamma-irradiation sterilization of UHMWPE components is associated with delamination[4] and fracture in artificial knee-joints." [DE 245-2 at 5, 2:10–13].  Additionally, the Hospital cites Dr. Noble's Expert Report, which similarly states that "studies of retrieved implants that had been implanted within patients, in comparison with unused components left on the shelf would show that UHMWPE components subjected to gamma ray sterilization in air were susceptible to long-term degradation

---

[4] Delamination means "[d]ivision into separate layers."  STEDMANS MEDICAL DICTIONARY (updated Nov. 2014).

through oxidation, embrittlement and formation of sub-surface cracking." [DE 250-2 at 15–16, ¶ 31)]. Based on this evidence, the Hospital asserts that POSAs in 2001 knew that gamma-in-air irradiated polymers, like those considered in Hamilton, were not oxidation-resistant. [DE 308 at 22]. Moreover, the Hospital relies upon Dr. Noble's Rebuttal Expert Report, which explains that Hamilton's process focused on gamma barrier packaging to improve wear and oxidation resistance but did not change the oxidation resistance of the implant enclosed in the packaging. [DE 250-3 at 49–51, ¶ 77]. Adopting Dr. Noble's opinion, the Hospital essentially contends that as of 2001, the art of polyethylene implants had not yet evolved to the point where thermal treatments to extinguish free radicals were not necessary to prevent the oxidation that plagued implants. Considering Hamilton with this historical context in mind, the Hospital contends that POSAs in 2001 would have understood that thermal treatments were necessary to prevent oxidation even if Hamilton did not expressly required them. In other words, the Hospital appears to be arguing that Hamilton inherently disclosed the use of thermal treatments, directly opposite to DePuy's position that Hamilton inherently disclosed a lack of thermal treatments.

Not surprisingly, DePuy rejects the Hospital's arguments regarding whether Hamilton discloses the Oxidation Resistant Limitation. In support, DePuy relies first upon language in the Hamilton specification explaining that the Hamilton process "reduce[s] the potential for oxidation of the material" [*See* DE 245-4 at 7, 5:61–64] to show that the polyethylene is oxidation-resistant. Second, DePuy cites Dr. Noble's testimony for the proposition that "the claims of the '817 [patent] do ***not*** require any particular level or 'absolute value' of oxidation resistance, and that the relevant question is whether the implant has improved its oxidation resistance over some other polyethylene." [*See* DE 246-2 at 5, 6–8, 74:13–20, 77:20–79:2]. Based on Dr. Noble's testimony that the '817 patent does not require an absolute measure of

oxidation resistance but rather provides a method for improving oxidation resistance based on unique properties sought by each POSA, DePuy concludes that "Hamilton expressly discloses that its method improves oxidation resistance." [DE 242 at 16].

Third, DePuy cites its expert, Dr. Spiegelberg, who opined that Hamilton achieved the oxidation resistance properties of the '817 patent based on Hamilton's goal of "improving the wear resistance and oxidation resistance of [bioimplantable polymeric] articles." DE 245-4 at 5, 1:8–10. [DE 242 at 17 (citing Spiegelberg's Declaration [DE 245-9 at 11, ¶ 35])]. And lastly, DePuy challenges the credibility of Dr. Noble's opinion that gamma barrier packaging combined with irradiation in an inert atmosphere, as taught by Hamilton, does not change the inherent oxidation resistance of an implant by alleging that his supporting sources were irrelevant or contradictory to his conclusion.

Despite this litany of opposing evidence, neither party completely accounts for its opponent's evidence. As such, DePuy has not shown by clear and convincing evidence that Hamilton disclosed the Oxidation Resistance Limitation and invalidated the '817 Patent by anticipation. Instead, the Hospital has presented sufficient evidence to establish a genuine dispute of material fact as to whether Hamilton discloses the oxidation-resistance central to Claim 1 of the '817 patent. Similarly, a genuine dispute of material fact likely exists as to whether Hamilton discloses the Highly Resistant Limitation.

As noted above, the Court declined to construe the Highly Resistant Limitation during the *Markman* process because the '817 patent had not yet issued and no authority compelled claim construction of patent application terms. [DE 163 at 13]. Without any claim construction on the Highly Resistant Limitation, DePuy argues that the '817 patent specification dictates that the term "highly resistant to oxidation" be interpreted to mean "oxidation resistant." DePuy also

contends, just as it did during claim construction, that the only possible interpretation of the Highly Resistant Limitation that would not render the claim indefinite requires equating "highly resistant to oxidation" with "oxidation resistance."

In support of this conclusion, DePuy argues that nothing in any of the 110 Family patents' intrinsic records distinguish between polyethylene that is merely "oxidation resistant" and polyethylene that is "highly resistant to oxidation."  DePuy also suggests that Dr. Noble agrees with its interpretation based on his Rebuttal Expert Report where he describes part of the '710 patent specification as a "high level" explanation of "the invention."  [DE 242 at 19]. Specifically, Dr. Noble stated that:

> the specification explains the invention at a high level:  "In the present invention, since the polyethylene has been formed in a manner that renders it highly resistant to oxidation, despite the presence of free radicals, there is no need to thermally treat the polyethylene during or after radiation crosslinking (e.g., by annealing or remelting) in order to extinguish the residual free radicals, and thus simplifying the manufacturing process."  (['710 patent] at 7:51–21.)

[DE 246-3 at 8–9, ¶ 806].

The Hospital, on the other hand, contends that an implant that is "highly resistant to oxidation" has an oxidation resistance equivalent to that of remelted polyethylene citing Dr. Noble's deposition testimony that "[a]s of 2001, [he] would have characterized remelted polyethylene . . . as being examples of highly oxidation-resistant polyethylenes."  [DE 309-8 at 94, 93:2–6].  Moreover, the Hospital refutes DePuy's contention that the intrinsic records of the 110 Family patents provide no distinction between "oxidation resistant" and "highly resistant to oxidation" by quoting the file wrappers for the '347 patent and '710 patents, which discuss the Highly Resistant Limitation in the context of remelted polyethylenes.

According to the '347 patent,

> [a]fter the subsequent melting the [Electron Paramagnetic Resonance] free radical signal was reduced to undetectable levels. These results indicated that the free radicals induced by the irradiation process were substantially eliminated after the subsequent melting step. Thus, the UHMWPE was highly resistant to oxidation.

[DE 309-9 at 48]. Similarly, the '710 patent refers to remelted polyethylene when it states:

> When free radicals are formed in polyethylene, which occurs with gamma irradiation for sterilization, crosslinking of polyethylene molecules is a competing reaction to oxidation. The crosslinking reaction can be driven to completed (extinguish the free radicals) by heating the material. If it is heated above the melt point (*i.e.*, the temperature at which the crystalline regions become amorphous), the free radicals are rapidly and thoroughly extinguished, providing a material that is highly resistant to oxidation.

[DE 309-3 at 15]. The Hospital also supports its position by quoting DePuy's own expert, Dr. Blanchard, who used the term "highly resistant to oxidation" in her academic publications to refer to remelted polyethylene. *See* Stoller AP, Johnson TS, Popoola OO, Humphrey SM, Blanchard CR, *Highly Crosslinked Polyethylene in Posterior-Stabilized Total Knee Arthroplasty*, 26 The Journal of Arthroplasty 483, 489 (2011) ("remelted HXPE material is highly resistant to oxidation, because the thermal processing reduces free radicals to a level that is at or below the detectability limit for current equipment . . .").

The parties' competing evidence establishes another genuinely disputed material fact as to what is precisely disclosed by Hamilton, this time related to the Highly Resistant Limitation. To resolve that dispute, some clarity as to the meaning of the term may be required. Thus, additional claim construction may be appropriate. However, the Highly Resistant Limitation need not undergo formal claim construction under *Markman* for this Court to determine that DePuy cannot survive summary judgment for invalidity based on anticipation by Hamilton. As discussed above, the genuine dispute of material fact as to whether Hamilton discloses an oxidation-resistant implant precludes any finding that Hamilton discloses the Thermal Treatment Limitation. Therefore, DePuy has not established by clear and convincing evidence that

22

Hamilton discloses all the elements and limitations of the '817 Patent, which precludes judgment as a matter of law that Hamilton anticipates the '817 Patent.

### B]      Li

DePuy's contention that Li anticipates Claims 1–3 and 5 of the '817 Patent are similarly unpersuasive.  Just as it did in opposing summary judgment based on Hamilton's alleged anticipation of the '817 Patent, the Hospital develops arguments as to whether Li discloses the Thermal Treatment, Oxidation-Resistance, and Highly Resistant limitations in Claim 1 of the '817 Patent Limitation while merely referencing additional disputes of material fact related to other limitations contained in the '817 Patent's dependent claims.  [DE 310 at 16 n.9].  As confirmed below, the parties' string of evidence as to what Li discloses reveals genuine disputes of material fact similar to those discussed above related to Hamilton.

DePuy's argument that Li discloses the Oxidation Resistance Limitation starts with the Li specification itself, which states that "[t]he Molded Cross Linked, Low-Modulus Polyethylene materials according to the invention will preferably have oxidation resistance."  [DE 245-7 at 18, 5:9–11].  Based on this sentence, DePuy concludes that Li's preferred embodiments of his invention are oxidation-resistant.  DePuy also notes that Li is directed to a direct molded implant and appears to argue that direct molded implants are inherently oxidation-resistant based on the '817 specification, which identifies direct molding as one method for creating an "oxidation-resistant" implant consistent with the '817 invention.  [DE 245-1 at 9, 7:63–8:7].  As additional support for this conclusion, DePuy cites the specifications for both Li and the '817 Patent because they both mention another patent, U.S. Pat. No. 5,721,334, as prior art disclosing a direct molding technique that can be used to make oxidation-resistant implants pursuant to both patents.  *Compare* Li ("Direct molding techniques that can be used to make devices according to

the invention are described in U.S. Pat. No. 5,721,334 . . . ." [DE 245-7 at 17–18, 4:66–5:5], *and*

the '817 specification (stating that the '334 patent "does not disclose that its methods produce

oxidation-resistant UHMWPE[, but] discloses a five-step direct molding method [that] applicants

believe . . . could be used to produce oxidation-resistant UHMWPE implants." [DE 245-1 at 10–

11, 10:41–11:15].

The Hospital, however, presents additional evidence that brings into question whether

direct molded implants are inherently oxidation-resistant as DePuy asserts. The Hospital points

to Dr. Noble's Rebuttal Expert Report, in which he distinguishes Li because it does not disclose

data demonstrating that its implants are in fact oxidation-resistant. [DE 250-3 at 40, ¶ 64]. The

Hospital also argues that the '817 Patent allows for the use or combination of assorted methods

to create implants so long as the final implant is oxidation-resistant, a result for which Li

provides no testing or selection procedure like the '817 Patent does. [DE 245-1 at 12–13, 13:26–

15:6]. Even more persuasively, the Hospital points the Court toward the specification of the

'817 Patent, which states that "unsuitable conditions of the [direct molding] process could cause

less resistance to oxidation." [*Id.* at 9, 8:18–20 (citing Mori, *et al.*, *Effects of Manufacturing*

*Method and Condition on UHMWPE Wear*, Soc. Biomaterials, Sixth World Biomaterials

Conference Transactions, 1122 (2000))]. Based on the same prior art, Dr. Noble opined that "a

[POSA] in early 2001 understood that the results of Li's disclosed direct molding techniques are

unreliable and sensitive to the fabrication conditions." [DE 250-3 at 40, ¶ 64]. Considering both

DePuy's and the Hospital's evidence, a clear question of fact remains as to whether direct

molded implants are inherently oxidation-resistant.

Nevertheless, DePuy also contends that the Hospital's own expert, Dr. Noble, testified

that Li discloses the Oxidation Resistance Limitation. In support, DePuy once again cites to Dr.

Noble's deposition testimony that "the claims of the '817 [patent] do ***not*** require any particular level or 'absolute value' of oxidation resistance, and that the relevant question is whether the implant has improved its oxidation resistance over some other polyethylene." [*See* DE 246-2 at 5, 6–8, 74:13–20, 77:20–79:2]. From this, DePuy concludes that Dr. Noble, and by extension the Hospital, has conceded that Li teaches the Oxidation Resistance Limitation because it discloses an improvement in oxidation resistance just like the '817 Patent even if the two inventions reflect different resulting properties.

DePuy further alleges that Dr. Noble agrees that oxidation resistance was the crux of the Li invention based on the following testimony from Dr. Noble's deposition.

> Q. So when you were describing the Li patent here, you said that the crux of his invention was the observation that his direct molded implants were oxidation resistant. Right?
>
> A. Yes.
>
> Q. And so – and it was your observation in Paragraph 429 that implants made according to Li's process were certainly more oxidation resistant that some predicate devices, correct?
>
> A. That's what I've stated, yes.

[*Id.* at 12–13, 195:25–196:11].

Even if both Li and the '817 Patent focused on improvement in oxidation resistance, Dr. Noble's testimony can reasonably be interpreted differently than DePuy contends. Indeed, the Hospital admits that "implants made according to Li's process were certainly more oxidation resistant than some predicate devices" citing Dr. Noble's Rebuttal Expert Report. [DE 250-3 at 20–21, and 40 ¶¶ 29–34, 64]. However, Dr. Noble explains further that the predicate devices Li tested were not oxidation-resistant because they were irradiated in air. [*Id.* at 20–21, 40, ¶¶ 29–34, 64]. Based on that aspect of Li, Dr. Noble opined that a POSA in 2001 would have known

25

that the Li implants were not oxidation-resistant, that thermal treatments would prevent oxidation, and that such thermal treatments were not foreclosed by Li as long as they did not exceed the melting temperature of the material.  [*Id.* at 40, 164, ¶¶ 64, 448].  Accordingly, DePuy has failed to demonstrate by clear and convincing evidence that an implant made according to Li would be understood by a POSA to be oxidation-resistant without application of the techniques taught by the '817 patent.

As to the Thermal Treatment Limitation in Li, DePuy relies upon the same argument used for Hamilton, but expands it given the unique claims in Li.  For instance, Li teaches crosslinking of UHMWPE articles, shaped by direct compression molding, with irradiation doses above 4 Mrads, but between 5 and 10 Mrads to create a tough, wear-resistant UHMWPE.  [DE 245-7 at 2, Abstract].  The Li specification's detailed description of the invention explicitly states that "[h]eating the irradiated material to the melting point of UHMWPE is not desirable and can cause deleterious effects . . . ."  [*Id.* at 18, 5:60–61].  Li goes on to say that "the irradiated material should not be heated above its melting point at any time" and that "[a]ccording to the . . . invention, no heating after irradiation is required."  [*Id.*, 5:63–67].

DePuy acknowledges that during IPR, the PTAB found its arguments insufficient to establish that Li disclosed the Thermal Treatment Limitation.  Yet DePuy still seems to argue that the Thermal Treatment Limitation is inherently disclosed by Li.  In support, DePuy directs the Court's attention to Li's focus on direct molded implants, a technique allowed in the 110 Family patents, including the '817 Patent.  DePuy notes the '710 Patent's specification which explains that "remelting or annealing of the UHMWPE . . . may cause excessive distortion of an implant."  [DE 245-2 at 8, 7:22–25].  From this, DePuy concludes that thermal treatments such as melting or annealing of direct molded implants, like those at the heart of Li, would be

26

impossible because of the distortion that would result.  As such, DePuy argues that Li discloses the Thermal Treatment Limitation in Claim 1 of the '817 Patent.

DePuy also relies on Dr. Li's own perspective on his patent to show that a POSA would have understood the Li Patent to disclose the Thermal Treatment Limitation.  At his deposition on January 21, 2016, Dr. Li testified that he intended his patent to convey to POSAs that thermal treatments of his direct molded implants were not necessary.  [DE 246-5 at 4, 43:20–25].  In addition, Dr. Li testified that the examples of implants provided in his patent were created without any thermal treatments.  [*Id*. at 5, 44:1–4].

DePuy further contends that Dr. Noble agrees that Li discloses a process that a POSA would understand does not require a thermal treatment to extinguish free radicals.  In support, DePuy cites Dr. Noble deposition testimony as follows:

> Q.  And based on that, a person of skill in the art would have understood that they could avoid thermally treating the polyethylene during or after irradiation . . . in the direct compression molded product of Li?
>
> A.  That's my understanding of his words here in the patent.

[DE 246-2 at 14, 200:10–22].  In other words, DePuy argues that Dr. Noble conceded that the use of a thermal treatment in the Li process is optional, not required.

Optional limitations can disclose negative limitations.  *Upsher-Smith Labs. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1322 (Fed. Cir. 2005).  In *Upsher-Smith*, patents for a vitamin supplement composition were invalidated based on prior art that "optionally includes[d]" antioxidants.  *Id.*  The key distinguishing claim in the patents-at-issue was a negative limitation that the compositions must be "essentially free of antioxidants."  *Id.* at 1321.  Thus, the Federal Circuit was assessing whether an optional limitation in the prior art disclosed a negative limitation in the patents-at-issue.  The court found that the prior art's "optional inclusion" of

27

antioxidants taught vitamin supplement compositions that both do and do not contain antioxidants. *Id.* at 1322. The court also found that the compositions made without antioxidants according to the prior art would infringe the asserted claims of the patents-at-issue. *Id.* Therefore, the court held that the prior art anticipated the patents-at-issue despite no express negative limitation in the prior art. *Id.*

DePuy suggests that *Upsher-Smith* is applicable here. The Thermal Treatment Limitation in Claim 1 of the '817 Patent is indeed comparable to the negative limitation in the *Upsher-Smith* patents-at-issue. Li, however, unlike the prior art in *Upsher-Smith*, does not expressly disclose an optional limitation. Instead, Li merely states that "no heating after irradiation is required." DE 245-7 at 18, 5:66–67]. Nevertheless, DePuy contends that Li discloses an optional limitation just like the prior art in *Upsher-Smith* explicitly did. In other words, DePuy asks this Court to find that Li's alleged optional limitation discloses the Thermal Treatment Limitation even though it does not do so expressly. The undersigned is not persuaded.

As stated earlier, a claim need not be explicitly disclosed in the prior art to constitute anticipation if the claim or limitation is inherent in the prior art. *Sanofi-Synthelabo*, 550 F.3d at 1082. However, "[i]nherency . . . may not be established by probabilities or possibilities." *MEHL/Biophile Int'l Corp.*, 192 F.3d at 1365. "The mere fact that a certain thing *may* result from a given set of circumstances is not sufficient." *Id.* "If, however, the disclosure is sufficient to show that the natural result flowing from the operation as taught would result in the performance of the questioned function, it seems to be well settled that the disclosure should be regarded as sufficient." *Id.*

Here, the Hospital's evidentiary showing, cited above, shows that a genuine dispute of material fact exists as to whether the natural result of practicing Li, as viewed through the lens of

a POSA in 2001, would result in refusing to thermally treat the material to extinguish free radicals. Indeed, the parties' references above show that disclosure of the Thermal Treatment Limitation is a factual issue likely to be resolved by a battle of the experts opining on the perspective of POSAs in 2001. *Upsher-Smith* alone does not constitute clear and convincing evidence that Li discloses the Thermal Treatment Limitation.

Therefore, the Hospital has established genuine disputes of material fact as to whether Li discloses the Oxidation Resistance and Thermal Treatment Limitations. Both DePuy and the Hospital further dispute whether Li discloses the Highly Resistant Limitation based on arguments identical to those already resolved in relation to anticipation by Hamilton. The outcome for Li is the same. The parties' competing evidence establishes a genuine dispute of material fact as to whether Li discloses the Highly Resistant Limitation. Additional claim construction may ultimately be required but not at this time because the genuine disputes of material fact as to whether Li discloses the Oxidation Resistance and Thermal Treatment Limitations show that DePuy has failed to show by clear and convincing evidence that Li discloses all the elements and limitations of the '817 Patent. Therefore, DePuy is not entitled to judgment as a matter of law that Li anticipates Claims 1–3 and 5 of the '817 Patent.

### d.    Obviousness

#### i.    Legal Standard

A patent claim is obvious and thus invalid "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious [at the time the invention was made] to a person of ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103. "A patent may [be] invalid as obvious even if it has not been anticipated by prior art." *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548

(Fed. Cir. 1983). The obviousness "analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). "If a person of ordinary skill can implement a predictable variation, [Section] 103 likely bars its patentability." *Id.* at 417. "A person of ordinary skill is also a person of ordinary creativity, not an automaton," and he or she may employ common sense to "fit the teachings of multiple patents together like pieces of a puzzle" or "pursue the known options within his or her technical grasp." *Id.* at 420–21.

"Obviousness must be proved by clear and convincing evidence." *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1353 (Fed. Cir. 2013) (citing *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009)). "Thus, the inquiry on summary judgment is whether a jury applying the clear and convincing evidence standard could reasonably find, based on the evidence produced by the accused infringer, that the claimed invention was obvious. *Plantronics, Inc.*, 724 F.3d at 1353 (citing *TriMed, Inc. v. Stryker Corp.,* 608 F.3d 1333, 1339–40 (Fed. Cir. 2010)). In the end, however, obviousness is determined on a case-by-case basis. *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1305 (Fed. Cir. 2010)).

### ii.    Analysis

In challenging DePuy's obviousness contentions, the Hospital does not directly argue against DePuy's assertion that Li, in view of Shen, renders obvious Claims 10–12 of the '817 Patent. Similarly, the Hospital does not directly challenge whether Li or Hamilton, in combination with Tomita and Shen, renders obvious Claims 2–4 and 6–15 of the '710 Patent. Instead, the Hospital rejects DePuy's obviousness arguments asserting that (1) DePuy's

obviousness analysis is incomplete because it does not address the objective indicia of nonobviousness required under *Graham*, 383 U.S. at 17–18; (2) a genuine dispute of material fact as to the motivation for a POSA in 2001 to combine the teachings of Hamilton or Li with Tomita and Shen in any combination; and (3) DePuy cannot show that Hamilton or Li in view of Tomita and Shen discloses the Thermal Treatment Limitation or the claimed ranges of physical properties present in all the claims of the '710 Patent.

### A]    Objective Indicia of Nonobviousness

"Obviousness is a question of law based on underlying questions of fact." *Green Edge Enters., LLC v. Rubber Mulch Etc., LLC*, 620 F.3d 1287, 1298 (Fed. Cir. 2010). To reach any legal conclusion related to obviousness, the court must make factual determinations as to (1) "the scope and content of the prior art;" (2) "the level of ordinary skill in the pertinent art;" (3) "differences between the prior art and the claims at issue;" and (4) relevant objective considerations such as "commercial success, long felt but unsolved needs, [and] failure of others . . . ." *KSR Int'l*, 550 U.S. at 406 (quoting *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17–18 (1966)). Objective indicia of nonobviousness "may often be the most probative and cogent evidence of nonobviousness in the record." *In re Cyclobenzaprine Hydrochloride Extended Release Capsule Patent Litigation*, 676 F.3d 1063, 1075 (Fed. Cir. 2012) (citing *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538–39 (Fed. Cir. 1983)). "A district court must *always* consider any objective evidence of nonobviousness presented in a case" even if it ultimately finds that the objective evidence does not overcome other evidence establishing obviousness. *Transocean Offshore Deepwater Drilling*, 617 F.3d at 1305; *see also Bradford Co. v Afco Mfg.*, No. 1:05-cv-449, 2007 U.S. Dist. LEXIS 31975, at *34 (S.D. Ohio Apr. 30, 2007).

DePuy does not dispute the Hospital's assertion that its opening briefs for summary judgment, the parts of which alleged the invalidity of in the '817 and '710 Patents based on obviousness, do not address any objective indicia of nonobviousness. Yet this alone does not doom DePuy's motion for summary judgment as the Hospital contends. Indeed, the patent owner—here, the Hospital—bears the burden of producing evidence of such secondary considerations in the obviousness analysis. *See Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1350 (Fed. Cir. 2000). As the summary judgment movant, DePuy was only obligated to address objective indicia of nonobviousness after the Hospital met its burden of production.

In its response brief, the Hospital contends that it presented evidence of such objective indicia including failure of others, skepticism, commercial success, and DePuy's advertising touting patented features. In support, the Hospital cites two DePuy brochures regarding its AOX knee systems, which report product benefits including incorporation of an antioxidant into the polyethylene to "stabilize[] free radicals and prevent[] oxidation [and] eliminate[] the need for a heat treatment [with m]oderate levels of cross-linking." [DE 283-6 at 3; DE 283-7 at 3]. Additionally, the Hospital cites one sentence in Dr. Noble's 250+ page Rebuttal Report opining that "even today—nearly 15 years after the first of the 110 [Family] Applications was filed— very well-known researchers in the orthopaedic field still believe that UHMWPE containing antioxidant should be annealed." [DE 250-3 at 255, ¶ 817]. The Hospital does not, however, indicate *when* it explicitly produced this evidence as objective evidence of nonobviousness.

Even assuming DePuy possessed this evidence in its original form, as produced during discovery, when it prepared its motions for summary judgment, nothing in the record suggests that the Hospital identified this specific evidence amidst the voluminous materials at issue in this case as objective evidence of nonobviousness before filing its brief in response to DePuy's

instant motions for summary judgment.  Moreover, DePuy addressed the Hospital's alleged objective evidence of nonobviousness in its reply brief.  Therefore, DePuy satisfied any burden it had with regard to the objective indicia of nonobviousness once the Hospital satisfied its own burden of production and its motion for summary judgment with respect to the '710 Patent is not defeated on this production issue alone.

However, analysis of the objective evidence of nonobviousness cited by the Hospital shows that at least one genuine dispute of material fact exists as the obviousness of the '710 Patent.  Objective evidence of nonobviousness is only significant to the obviousness analysis if there is a nexus between the claimed invention and the objective evidence.  *See Ormco Corp. Align Tech., Inc.*, 463 F.3d 1299, 1311–12 (Fed. Cir. 2006).  To establish the required nexus, the patentee must show that any secondary indicia of nonobviousness is due to a patented feature that is not found in the prior art.  *See Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1369–70 (Fed. Cir. 2011).  A nexus alone, however, cannot overcome a strong *prima facie* showing of obviousness.  *See, e.g., id.*, at 1371; *Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008); *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007).

Despite DePuy's contention to the contrary, Dr. Noble's opinion as to current researchers' expectations that antioxidant containing polyethylenes should be annealed, combined with his opinions about the commercial success of AOX, show yet another dispute of material fact as to the Thermal Treatment Limitation.  DePuy essentially argues that Dr. Noble's opinions are not persuasive because no nexus exists between them and the key feature for patentability of the '710 Patent—the Thermal Treatment Limitation.  DePuy again relies upon its own conclusion that the Thermal Treatment Limitation is disclosed in prior art in its attempt to overcome Dr. Noble's opinions cited here.  Similarly, DePuy argues that its marketing materials

that the Hospital cites as objective evidence of nonobviousness are irrelevant based on the same disputed question of whether the Thermal Treatment Limitation was disclosed in the prior art. Based on the foregoing, a genuine dispute of material fact exists as to the Hospital's cited objective evidence on nonobviousness leaving the obviousness analysis dependent upon whether DePuy has otherwise established a strong *prima facie* showing of obviousness and whether the objective evidence of nonobviousness is strong enough to overcome it. As shown below, DePuy has not established a strong enough *prima facie* showing of obviousness to be entitled to judgment as a matter of law.

### B]    Motivation to Combine Prior Art References

In an obviousness analysis based on the combination of prior art references, a POSA's motivation to combine those references must be based on more than just common sense. *Plantronics, Inc.*, 724 F.3d at 1353. "Rejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR Int'l*, 550 U.S. at 418. Here, DePuy alleges obviousness noting initially the apparent common sense conclusion that Hamilton, Li, Tomita, and Shen are all relevant prior art references related to the field of wear-resistant and oxidation-resistant polyethylene orthopaedic implants. Unlike Hamilton or Li, Tomita discloses the addition of an antioxidant to improve oxidation resistance while Shen discloses ranges of physical characteristics of the polyethylene. Both Tomita's antioxidant and a narrower range of the same physical characteristics disclosed by Shen are incorporated into the 110 Family Patents. DePuy argues that a POSA in 2001 would have been motivated to combine Hamilton or Li with Tomita or Shen rendering the 110 Family Patents obvious.

34

DePuy expands its argument beyond common sense, however, by citing the opinions of its expert, Dr. Spiegelberg [DE 245-9, DE 245-10]; the opinions of the Hospital's expert, Dr. Noble [DE 246-2, DE 246-3]; the testimony of the inventor, Dr. McKellop [DE 246-4]; and one of the 110 Family Applications [DE 245-6]. According to DePuy, this evidence shows that a POSA would have been motivated to combine Tomita's antioxidant with Hamilton or Li to address the problem of oxidation resistance well known in the field at that time. Additionally, DePuy argues that a POSA would have been motivated to combine Shen's broader range of physical characteristics with Hamilton or Li knowing that those characteristics could be manipulated to the narrower ranges incorporated into the 110 Family Patents through adjustments to irradiation doses and the amount of added antioxidant.

The Hospital, on the other hand, directs the Court to evidence allegedly showing that a POSA would not have been motivated to combine Hamilton or Li with Tomita or Shen. As to Tomita, the Hospital argues that DePuy has not explained why a POSA would be motivated to add a Tomita antioxidant to the Hamilton or Li polyethylene that DePuy contends is already highly resistant to oxidation. Moreover, the Hospital contends that combining the antioxidant in Tomita with Hamilton or Li would result in an antioxidant-containing polyethylene that is irradiated above 2 Mrad, which its own expert, Dr. Noble, equated with the prior art of Lidgren. [*See* Noble Report, DE 250-3; Lidgren, DE 309-7]. According to the Hospital, Lidgren explicitly teaches the thermal treatment of an antioxidant when irradiated above 2 Mrad. Relying on Dr. Noble's opinion, the Hospital concludes that the combination of Hamilton or Li with Tomita would be result in antioxidant-containing polyethylene being irradiated above 2 Mrad consistent with the teaching of Lidgren. Significantly, the Hospital cites the PTAB's

decision denying DePuy's petition for IPR on the '710 and '347 Patents, which explicitly rejected Lidgren.  [*See* '347 IPR Decision, DE 309-4; '710 IPR Decision, DE 309-5].

DePuy rejects the Hospital's interpretation based on its expert's opinions, but in so doing, confirms the existence of a genuine dispute of material fact as to a POSA's motivation to combine Hamilton or Li and Tomita.

> [T]he district court on summary judgment should not simply surround itself with the prior art and make factual determinations based thereon as to the substitutability of elements as though the district court were skilled in the art. That is a function for the jury after trial upon hearing appropriate testimony from those skilled in the particular art.

*Sys. Div., Inc. v. Teknek LLC*, 59 F. App'x 333, 343 (Fed. Cir. 2003).  As a result, summary judgment here would be an inappropriate usurpation of the role of the fact finding jury.

Similarly, the parties cite competing evidence as to whether a POSA would have been motivated to combine Hamilton or Li with Shen.  In challenging DePuy's contention that the broader ranges of physical characteristics disclosed by Shen, which did not contain an antioxidant, would render obvious the narrower ranges of properties for an antioxidant-containing polyethylene as set forth in Claim 1 of the '710 Patent, the Hospital cites DePuy's expert, Dr. Spiegelberg, on the effect of an antioxidant on crosslinking and the ranges of material properties.  Again, the parties' competing evidence creates a genuine dispute of material fact— whether a POSA would have been motivated to combine Hamilton or Li with Shen—making summary judgment inappropriate.

### C]  Disclosure of the Thermal Treatment Limitation

Finally, DePuy's obviousness argument depends totally on the premise that both Hamilton and Li disclose the Thermal Treatment Limitation.  The undersigned has already recommended that the Court find that genuine disputes of material fact exist as to whether

Hamilton or Li disclose the Thermal Treatment Limitation.  As such, DePuy's argument for summary judgment based on obviousness fails.

### e.    Invalidity Conclusion

For the reasons stated above, genuine disputes of material fact exist as to whether Hamilton or Li discloses the Oxidation Resistant Limitation, the Highly Resistant Limitation, and the Thermal Treatment Limitation in Claim 1 of the '817 Patent.  As such, DePuy has not shown by clear and convincing evidence that Hamilton or Li disclosed all the elements of Clam 1 of the '817 Patent and is not entitled to judgment as a matter of law that Claims 1–3, 5, and 10–12 Claims of the '817 Patent are invalid by anticipation under 35 U.S.C. § 102.

Similarly, genuine disputes of material fact exist as to whether a POSA in 2001 would have been motivated to combine Hamilton or Li with Tomita and Shen and, as already stated, whether Hamilton or Li disclose the Thermal Treatment Limitation in Claim 1 of both the '817 and '710 Patents.  As such, DePuy has not shown by clear and convincing evidence that Hamilton or Li in combination with Tomita and Shen would have rendered Claims 10–12 of the '817 Patent or Claims 1–4 and 6–15 of the '710 Patent obvious under 35 U.S.C. § 103.

Therefore, the undersigned **RECOMMENDS** that the Court **DENY** DePuy's motions for summary judgment for invalidity.  [DE 241, DE 243].

### C.    Non-Infringement [DE 251]

In its instant motion for summary judgment, DePuy alleges that its AOX products do not infringe, and are not covered by, any of the asserted claims in this case.

### 1.    Relevant Background

### a.    Asserted Claims and Relevant Claim Construction

As noted above, all of the claims asserted by the Hospital in the 110 Family Applications and Patents contain the Thermal Treatment Limitation, which prohibits "thermally treating the implant to extinguish free radicals."  During the claim construction process, DePuy argued that the plain and ordinary meaning of the Thermal Treatment Limitation was indefinite and that the inventor, Dr. McKellop, had disclaimed certain temperature and duration ranges during prosecution of the Patents.  In its claim construction order, the Court rejected DePuy's indefiniteness argument.  [DE 163 at 23–31].  The Court was persuaded by Dr. Noble's opinion that "a POSITA[5] would understand that the limitation means without heating the polyethylene to a temperature and for a duration that is sufficient to extinguish free radicals by more than a trivial amount."  [Id. at 26–28].

The Court also rejected DePuy's alternative argument that the Thermal Treatment Limitation should be construed to mean "without exposing the implant to temperatures of 25 degrees Celsius or higher for at least two hours".  [Id. at 31–33].  The Court reasoned that

> the Hospital would likely agree that generally speaking thermal treatments at 25°C or higher for two hours or more would be outside the scope of the Term. Arguably, the Hospital would sacrifice nothing if such thermal treatments were expressly excluded.  The problem, however, is that such a construction would be incomplete.  The Term defines the excluded thermal treatments based on how they extinguish free radicals, not based strictly on temperature and duration. . . . [P]ersons of ordinary skill in the art are capable of determining whether free radicals have been extinguished by a particular thermal treatment.  Accordingly, they can determine whether a specific thermal treatment is excluded even if it involves temperatures lower than 25°C for less than two hours.

[Id. at 32].  Accordingly, the Court found that "the plain and ordinary meaning of [the Thermal Treatment Limitation] was understood by [POSAs] at the time of the patent application in the context of the claim language itself" and held that "the plain and ordinary meaning of the

---

[5] POSITA is Dr. Noble's acronym for "person of ordinary skill in the art."

[Thermal Treatment Limitation] will apply in this litigation going forward." [*Id.* at 32–33].

Adopting the plain and ordinary meaning of the Thermal Treatment Limitation, the Court necessarily dispensed with DePuy's prosecution disclaimer argument as well.

### b.    Data regarding DePuy's AOX Products

DePuy began selling AOX polyethylene inserts as part of three knee systems between December 2011 and February 2012.  The AOX products are irradiated at one of three facilities: Chester, NY; Libertyville, IL; and Reading, England.  Testing revealed that during irradiation, commercially available AOX products reached temperatures of at ███████████████ at Reading in 2016 and ███████████████████ at Chester in 2015.  The Chester and Libertyville facilities use similar irradiation process such that products are exposed to ███ ██████████████ at both facilities.  After irradiation, AOX products are stored for weeks or months at ███████████, which has ranged from ██████████ since 2014.

As part of the FDA's approval process for AOX, DePuy provided data to the agency and answered subsequent questions about AOX and its data.  For instance, in September 2008 as part of material delivered to the FDA, DePuy disclosed a table ("the FRC Table") summarizing free radical concentration, as measured by EPR signal value, over time in samples of irradiated AOX and the predicate formulation of polyethylene, GVF (or gamma vacuum foil), which is not heat-treated.  [DE 297-5 at 28].  The AOX sample included in the FRC Table was irradiated in and tracked through 2007.  The AOX sample was made of materials under consideration during the development of AOX in 2007.  The 2007 testing was not done on the commercial AOX product. In addition, the 2007 AOX sample was irradiated in a different facility than the final AOX commercial products later were.

Nevertheless, the FRC Table disclosed that the 2007 AOX sample, labeled 46-12-3C1, was irradiated on February 2, 2007. [*Id.*]. In a subsequent report to the FDA in August 2009, DePuy stated that the EPR signal value of the AOX sample within a few days of irradiation was ███. [DE 297-3 at 6]. Three months later on May 14, 2007, the EPR signal value of the AOX sample was ███. After an additional three months on August 16, 2007, the EPR signal value had ████████. [DE 297-5 at 28]. In total, the 2007 AOX sample's free radical concentration ██████████ within about 6 months after irradiation.

The FRC Table also disclosed EPR signal values for a GVF sample, labeled 46-12-9C, which was irradiated on May 10, 2007. [*Id.*]. On May 14, 2017, within a few days of irradiation, the GVF sample's EPR signal value was ███. [*Id.*]. About three months later on August 16, 2007, the GVF sample's EPR signal value ██████████ and then ████████ ████████ on October 29, 2007. [*Id.*]. As a result, the table showed that the GVF sample's free radical concentration ██████████ within about 5-1/2 months after irradiation.

In August 2009, DePuy also provided the FDA with a report from its separate study, conducted in June 2009 ("the 2009 Study"), of free radical concentrations of AOX irradiated at 80KGy. [DE 297-3 at 206–08]. The 2009 Study considered the free radical concentration of AOX as compared to irradiated and remelted polyethylene ("XLK"). [*Id.* at 207]. In reporting on the 2009 Study, DePuy acknowledged "██████████ measured for AOX at 80 KGy," but stated that this was "hardly surprising given that the polymer sample ha[d] been irradiated without any subsequent attempt to thermally quench the free radicals generated as is done with remelting." [*Id.* at 208]. The report further stated that "[t]he radical quench step has been rendered redundant due to the incorporation of the antioxidant into the formulation prior to consolidation and irradiation." [*Id.*].

40

DePuy's August 2009 report to the FDA also included answers to specific questions about AOX raised by the agency.  Specifically, the FDA sought detailed information about the "full procedure and sequence for the device annealing, including temperature ([asking DePuy to] specify if this is done above or below the melting temperature of polyethylene), time, and melting temperature of [DePuy's] cross-linked AOX UHMWPE."  [*Id*. at 5].  DePuy answered: "No annealing occurs after fabrication and irradiation; therefore, there are no procedures and sequences to report."  [*Id*.].

The FDA also asked DePuy to "identify the free radical concentrations (via Electron Spin Resonance) in the AOX UHMWPE components of the final sterilized device [and to] compare [its] results to the amount present in a legally marketed predicate device."  [*Id*. at 6].  DePuy responded with additional information about the data on the FRC Table as mentioned above. [*Id*.].  DePuy further answered:

> The antioxidant molecule functions as a free radical trap and does not eliminate the free radical.  The free electron is scavenged by the antioxidant molecule generating a stable radical species.  Due to this stabilization, these radicals are no longer able to participate in oxidation.  Consequently, degradative reactions of UHMWPE cannot occur.  This is supported by the oxidative stability data reported in WR 070300 (MAF-1597, Volume II/II, page 370/846).  The verified oxidative stability confirms that this concentration of free radicals in AOX does not impact the device performance.

[*Id*. (emphasis from the original omitted)].

### c.    DePuy's Marketing of AOX

On DePuy websites for its SIGMA and LCS-COMPLETE knee systems last viewed on August 25, 2016, DePuy identifies the benefits of the "AOX™ Polyethylene" feature of the product in bulleted points that read:

- COVERNOX Antioxidant stabilizes free radicals and prevents oxidation

- Addition of an antioxidant eliminates the need for a heat treatment, thus maintains excellent mechanical properties

- Moderate levels of cross-linking for wear performance similar to XLK

[DE 297-17 at 3; DE 297-18 at 3]. In a DePuy brochure regarding AOX for its SIGMA and LCS systems, DePuy states that "[b]y eliminating the annealing or remelting process, AOX polyethylene delivers outstanding oxidative stability and optimum wear resistance without compromising the mechanical properties of polyethylene." [DE 297-14 at 4]. In a DePuy brochure regarding AOX for its ATTUNE knee system, DePuy states that "[t]he addition of free radical scavengers into polyethylene stabilizes the polymer by neutralizing the free radicals without the need for remelting . . . ." [DE 297-12 at 4].

## 2.    Legal Standard

"[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a). Summary judgment of non-infringement involves two analytical steps.[6] *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999) (citation omitted). First, the court determines, as a question of law, the meaning and scope of the asserted claims through the *Markman* claim construction process. *Id.*; *see also Whirlpool Corp. v. LG Elecs., Inc.*, No. 1:04-CV-100, 2006 WL 2035215, at *1 (W.D. Mich. July 18, 2006).

Second, the claims, as construed, are compared to the allegedly infringing device to determine whether the claims encompass the accused structure. *Pitney Bowes*, 182 F.3d at 1304. In order to establish literal infringement, the patentee must establish that every limitation set

---

[6] The analysis of whether a product infringes a patent claim, and the analysis of whether a product is covered by a patent claim, are the same. *See, e.g.*, *Jang v. Boston Sci. Corp.*, 532 F.3d 1330, 1331 (Fed. Cir. 2008).

forth in a claim is found in an accused product; the absence of a single element precludes a finding of infringement.[7] *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). To prevail on a motion for summary judgment, an accused infringer must "provid[e] evidence that would preclude a finding of infringement, or [show] that the evidence on file fails to establish a material issue of fact essential to the patentee's case." *Blackhawk Molding Co., Inc. v. Portola Packaging, Inc.*, 422 F. Supp. 948, 951 (N.D. Ill. Mar. 14, 2006) (citing *Vivid Techs. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 807 (Fed. Cir. 1999).

### 3. Analysis

DePuy's argument that AOX does not infringe any claims in the 110 Family Applications and Patents is premised upon its assertion that its AOX products are thermally treated to extinguish free radicals. More specifically, DePuy contends that the process used to manufacture its AOX products cannot meet the Thermal Treatment Limitation critical to the 110 Family claims because it indisputably treats the AOX products at (1) more than 25°C for more than two hours during radiation and (2) at room temperature for weeks or months after radiation. As a result, DePuy argues that AOX does not infringe and is not covered by the 110 Family Applications and Patents leaving no genuine dispute of material fact to preclude summary judgment in its favor. However, DePuy's arguments are not persuasive.

### a. DePuy's Improper Reliance on a Rejected Claim Construction

This Court already completed the first step in the infringement analysis when it issued its *Markman* claim construction order in January 2016. DePuy relies on the Court's statement in that order that "the Hospital would likely agree that generally speaking thermal treatments at

---

[7] "The patentee bears the burden of proving infringement by a preponderance of the evidence." *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991).

25°C or higher for two hours or more would be outside the scope of the [Thermal Treatment Limitation] . . . [and that] the Hospital would sacrifice nothing if such thermal treatments were expressly excluded." [DE 163 at 32].  Based on that statement, DePuy now contends that the Court explicitly construed the 25 + 2 Treatment to be outside the scope of the Thermal Treatment Limitation.  Accordingly, DePuy has submitted evidence to show that AOX was heated above 25°C for more than two hours expecting the Court to find no infringement and to grant summary judgment.  Indeed, the Hospital does not dispute DePuy's evidence that AOX was heated above 25°C for more than two hours.  The problem DePuy faces is that its interpretation of the Court's claim construction order misses the mark.

Despite DePuy's arguments to the contrary, the Court's reference to the 25°C and two-hour measurements in the claim construction order was not a conclusion.  It was merely a writing artifice used to set up the Court's conclusion, which came in the next sentences where the Court stated first that thermal treatments of more than 25°C for at least two hours might fall outside the scope of the Thermal Treatment Limitation, but nevertheless would be an incomplete analysis of the claim's scope.  [*Id.*].  The Court then laid out its explicit conclusion that "[t]he [Thermal Treatment Limitation] defines the excluded thermal treatments based on how they extinguish free radicals, not based strictly on temperature and duration."  [*Id.*].  The Court's order shows that temperature and duration are no doubt relevant to a POSA's determination of whether a thermal treatment extinguishes free radicals sufficiently to fall outside the scope of the Thermal Treatment Limitation.  However, the Court confirms that they are not the only factors to be considered.  As a result, the fact that AOX is exposed to temperatures above 25°C for two hours or more is not enough to show non-infringement.  Moreover, the Hospital presents evidence that

44

establishes a genuine dispute of material fact as to whether AOX is thermally treated outside the scope of the Thermal Treatment Limitation.

**b.      Genuine disputes of material fact**

In challenging DePuy's position that AOX was thermally treated to extinguish free radicals, the Hospital directs the Court's attention data DePuy submitted as part of the FDA approval process in 2008 and 2009.  The Hospital specifically references data from the 2007 testing, which showed that AOX had a free radical concentration ████████████ of GVF, a non-thermally treated polyethylene, within a few days of irradiation.  In addition, the same data showed that the free radical concentration of the AOX ████████████ over the course of the subsequent six months while the GVF's free radical concentration ████████████. The Hospital cites Dr. Noble's expert opinion about this data in support of its conclusion that AOX could not have been thermally treated to extinguish free radicals if its free radical concentration ████████████ over six months.

DePuy challenges Dr. Noble's reliance on the 2007 testing data.  DePuy contends that Dr. Noble should have conducted his own testing of the AOX products that were sold commercially. DePuy discounts the value of the 2007 testing data because the AOX sample used was still in development and was not the same as the polymer ultimately used in the orthopaedic implants it began selling in December 2011.  Additionally, DePuy argues that the 2007 AOX sample cannot be compared to the GVF sample because its irradiation dose was twice that of the GVF sample.

Similarly, DePuy challenges the Hospital's reliance upon the circumstantial evidence of DePuy's statements to the FDA and its marketing materials.  Yet, parties' statements to the FDA may be used to establish infringement.  *See, e.g.*, *Intendis GMBH v. Glenmark Pharms. Inc.*, 822 F.3d 1355, 1362 (Fed. Cir. 2016); *Amgen Inc. v. Hoffman-LaRoche Ltd.*, 580 F.3d 1340, 1385

(Fed. Cir. 2009). Moreover, marketing materials are appropriately considered as one of many factors in assessing whether an accused product meets all the limitations of asserted claims even if they are insufficient alone to establish infringement. *See Whirlpool*, 2006 WL 2035215, at *8. As such, DePuy's 2007 FRC Table, the report from its 2009 AOX free radical concentration Study, and its answers to questions about thermal treatments and free radicals in AOX must be considered in determining whether DePuy is entitled to summary judgment on non-infringement.

The Hospital and DePuy clearly present different interpretations of the reliability and effect of the 2007 FRC Table data on the current question of the whether AOX meets the Thermal Treatment Limitation. Yet, DePuy has not negated the Hospital's reasonable interpretation of the free radical concentration data it submitted to the FDA. *See Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1326 (Fed. Cir. 2015) (reversing summary judgment of non-infringement because the district court failed to evaluate evidence in the light most favorable to the nonmovant and accepted "self-serving testimony from [the accused infringer's] witnesses about the purported goal of its product design [that] does not negate the evidence in the record" regarding the key claim).

DePuy presents several arguments in opposition to the Hospital's interpretation of the 2007 FRC Table data. For instance, DePuy notes that (1) the data fails to quantify exactly how many free radicals were extinguished in the AOX samples and therefore whether a non-trivial amount of free radicals were extinguished; (2) the AOX and GVF samples were irradiated at different doses; (3) Dr. Noble and Dr. Blanchard reached different conclusions about the effect of the dosage difference; and (4) the Hospital has failed to explain how the process in the prior art of the Poggie Patent included a thermal treatment while the AOX process allegedly does not. While these differences clearly address material facts, they still do not negate the FRC Table data

46

showing ███████ in the AOX sample's free radical concentration, which is symptomatic of no thermal treatment.

Furthermore, DePuy has not presented evidence to negate its statements in the 2009 Study report that the AOX sample was "irradiated without any subsequent attempt to thermally quench the free radicals generated as is done with remelting" or that "[t]he radical quench step has been rendered redundant due to the incorporation of the antioxidant into the formulation prior to consolidation and irradiation." [DE 297-3 at 208]. These statements combined with DePuy's 2009 statement to the FDA "no annealing occurs after fabrication and irradiation" bring into question whether a thermal treatment did actually occur as DePuy contends. DePuy's evidence to the contrary clarifies the dispute rather than dispensing with it.

DePuy also argues against the Hospital's use of its own marketing materials as proof of infringement under an incomplete view of *Whirlpool*. In *Whirlpool*, the Court was applying its construction of the claim term "without mechanical agitation," in a patent for a washing machine, in its decision whether to grant summary judgment for non-infringement. 2006 WL 2035215. In an attempt to avoid summary judgment, the patentee relied upon the accused infringer's advertisements for its washing machine, which included terminology such as "without agitation" or "without mechanical agitation." *Id.* at *8. The court reasonably noted that "it is the washer, not the marketing materials, that are the subject of the infringement accusation" and that "[t]he marketing materials cannot override the actual operation of the [washer]." *Id.* Ultimately, however, the court granted summary judgment finding that the accused washer met the "without mechanical agitation" limitation based on evidence stronger than the statements in the advertising materials. *Id.* The court never extrapolated to the conclusion that advertising statements should never be considered in an infringement analysis. As such, DePuy's

interpretation of *Whirlpool* to support its argument to that effect goes too far. Thus, DePuy's marketing materials combined with the other FDA data and statements can be considered and do bring into question whether AOX meets the Thermal Treatment Limitation.

Therefore, DePuy's attempts to discount the Hospital's reliance on the data DePuy presented to the FDA, its statements to the FDA, and its statements in its own marketing materials preclude summary judgment. The record is replete with competing evidence that only confirms the existence of a genuine dispute of material fact as to whether AOX meets the Thermal Treatment Limitation. Any impeachment of that evidence is properly left to the fact finder at trial.

### 4.      Non-Infringement Conclusion

For the reasons stated above, a genuine dispute of material fact exists as to whether DePuy's AOX products meet the Thermal Treatment Limitation set forth in the 110 Family Patents and Applications. As such, DePuy is not entitled to judgment as a matter of law for non-infringement. Accordingly, the undersigned **RECOMMENDS** that the Court **DENY** DePuy's motions for summary judgment for non-infringement. [DE 251].

### D.      Contract Issues [DE 236]

#### 1.      Relevant Background

Among the Court's earliest decisions related to this consolidated action was its order dated February 13, 2015, granting in part and denying in part DePuy's motion for partial summary judgment on limited contract issues related to the PRLA. As relevant here, the Court granted summary judgment in part to DePuy "declar[ing] that DePuy properly exercised its right to abandon prosecution of the 110-related Patent Applications pursuant to Section 6.5 of the

PRLA."[8]  [DE 108 at 26].  However, the Court declined to decide exactly when DePuy effected

its Section 6.5 abandonment.  The parties disagreed as to whether a DePuy letter to the Hospital

dated February 16, 2012 ("the Cutshall Letter"), or a letter dated September 28, 2012 ("the

Tomko Letter") constituted the requisite written notice of abandonment.  The Court noted that

the exact date of abandonment would need to be determined to calculate damages accurately, but

only if DePuy were found liable for royalties.  [*Id*. at 19].

In the same order, the Court denied summary judgment as to the effect of DePuy's

Section 6.5 abandonment on its royalty obligations under the PRLA.  [*Id*. at 26].  More

specifically, the Court found that "a genuine dispute of material fact [exists] as to the intent of

the parties regarding DePuy's continuing obligation to pay royalties following its Section 6.5

abandonment."  [*Id*.].  Concluding that Section 6.5 is ambiguous as to the royalty obligation after

abandonment, the Court noted that "further development of the record, including extrinsic

evidence" would be necessary to ascertain the effect of abandonment on royalties under the

PRLA.  [*Id*. at 25].

Notably, the Court declined to reach any decision on the parties' dispute over whether the

PRLA lapsed in March 2006 under its termination clause in Section 10.1[9].  Relying upon the

---

[8] Section 6.5 states:
>   Notwithstanding any other provision of this Agreement to the contrary, DEPUY and its selected
>   legal counsel shall not abandon the prosecution of the Patent Applications or the maintenance or
>   enforcement of the Patents without 60 days prior written notice to OH. In any such case, OH shall
>   have the opportunity to prosecute the Patent Applications or maintain or enforce the Patents in its
>   own name at its own expense, and thereafter any such Patent Applications or Patents shall be the
>   sole property of OH and not subject to this Agreement. In such case, DEPUY shall use reasonable
>   efforts to ensure its investigators cooperate fully with OH to enable OH, as needed, to obtain,
>   maintain, or enforce Patent Rights.

[DE 238-1 at 7].

[9] Section 10.1 states:
>   The term of this Agreement shall expire on the later of 7 years from the Effective Date or the
>   expiration of the last applicable Patent unless earlier terminated based on the following provisions:

parties' shared position that the court could resolve the questions raised in DePuy's motion for partial summary judgment without resolving the lapse dispute, the Court only addressed the Section 6.5 abandonment issues as noted above.

### 2.    Analysis

#### a.    Issues for Review

DePuy seeks summary judgment as to its rights and obligations under the PRLA on two contractual issues:  (1) whether the PRLA expired on March 1, 2006, when no patents had issued from the Hospital's and DePuy's work together; and (2) whether DePuy's Section 6.5 notice of abandonment also ended its royalty obligations.  Resolving these issues requires interpretation of the meaning of the relevant provisions of the PRLA.

#### b.    Contract Interpretation Standard

Indiana law governs the contract interpretation issues raised in this case based on the parties' choice of law agreement reflected in Section 13.5 of the PRLA.  [DE 238-1 at 13]. "Summary judgment is particularly appropriate in cases involving the interpretation of contracts." *Murphy v. Keystone Steel & Wire Co., a Div. of Keystone Consol. Indus.*, 61 F.3d 560, 564–65 (7th Cir. 1995); *ECHO, Inc. v. Whitson Co.*, 52 F.3d 702, 705 (7th Cir. 1995).

---

(a) DEPUY or OH may terminate this Agreement immediately upon written notice if the other party is in material breach of this Agreement and remains so for sixty days after notice of any such breach by the non-breaching party;

(b) DEPUY may terminate this Agreement immediately upon written notice at any time after the expiration of the 36th month of this Agreement; and

(c) OH may terminate this Agreement or convert the exclusive license provided in this Agreement to a non-exclusive license, at any time immediately upon written notice if DEPUY is not commercially selling Products by the end of the 7th year of this Agreement.

[DE 238-1 at 10–11].

Under Indiana law, the primary goal in contract interpretation is to ascertain and effectuate the intent of the parties in executing the contract. *MPACT Constr. Group, LLC v. Superior Concrete Constructors, Inc.*, 802 N.E.2d 901, 906 (Ind. 2004). The parties' intent is determined by review of the parties' "expressions within the four corners of the written instrument." *Roy A. Miller & Sons, Inc. v. Indus. Hardwoods Corp.*, 775 N.E.2d 1168, 1172 (Ind. Ct. App. 2002). In assessing the intent of the parties, the threshold question is whether the contract, or any relevant provision, is ambiguous. If the language of a contract is clear and unambiguous, the court must give the contract's language its plain and ordinary meaning as a matter of law without considering any extrinsic evidence. *USA Life One Ins. Co. v. Nuckolls*, 682 N.E.2d 534, 538 (Ind. 1997); *Barclay v. State Auto Ins. Cos.*, 816 N.E.2d 973, 975 (Ind. Ct. App. 2004). "In applying this standard, courts will give a word or phrase its usual meaning unless the contract, when taken as a whole and considering its subject matter, makes clear that the parties intended another meaning." *Trs. of First Union Real Estate Equity & Mortg. Invs. v. Mandell*, 987 F.2d 1286, 1290 (7th Cir. 1993). However, "a contract will not be interpreted literally if doing so would produce absurd results, in the sense of results that the parties, presumed to be rational persons pursuing rational ends, are very unlikely to have agreed to seek." *Beanstalk Grp., Inc. v. AM Gen. Corp.*, 283 F.3d 856, 860 (7th Cir. 2002). Courts must look beyond the literal meaning of a single provision to interpret the contract as a whole. *Id.*

Yet a contract is not ambiguous simply merely because "each party favors a different interpretation." *N. Ind. Commuter Transp. Dist. v. Chi. SouthShore & S. Bend R.R.*, 744 N.E.2d 490, 496 (Ind. Ct. App. 2001). Rather, "a contract is ambiguous only if reasonable persons would differ as to the meaning of its terms." *IP of A W. 86th St. 1, LLC v. Morgan Stanley Mortg. Capital Holdings, LLC*, 686 F.3d 361, 367–68 (7th Cir. 2012) (internal quotations

omitted); *see also Beam v. Wausau Ins. Co.*, 765 N.E.2d 524, 528 (Ind. 2002). If a contract term is ambiguous, its meaning "may well need to be determined by extrinsic evidence," in which case "its construction is a matter for the factfinder" and "resolution of this issue is inappropriate for summary judgment." *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1133 (Ind. 1995) (citing *First Fed. Sav. Bank of Ind. v. Key Markets, Inc.*, 559 N.E.2d 600, 604 (1990)).

### i.    Expiration of the PRLA under Section 10.1

DePuy argues that under Section 10.1 of the PRLA, the PRLA expired on March 1, 2006. DePuy bases its argument on the language of Section 10.1, which provides that "[t]he term of this Agreement shall expire on the later of 7 years from the Effective Date or the expiration of the last applicable Patent . . . ." [DE 238-1 at 10], and the fact that on March 1, 2006—seven years from the Effective Date of the PRLA—none of the 110 Family Patents had issued. Assuming the PRLA expired on March 1, 2006, DePuy concludes that it is not obligated to pay any royalties on the sale of AOX, which was not sold before December 2011 or more than five years after the PRLA with its royalty provision allegedly expired. DePuy explicitly states that "resolution of this issue in [its] favor will dispose of [the Hospital's] breach of contract claims in their entirety." [DE 239 at 5].

On the surface, DePuy's conclusion is not only plausible, but highly reasonable. In fact, the Hospital does not dispute the two premises of DePuy's argument: the language of Section 10.1 and the fact that no patents had issued as of March 1, 2006, the alleged expiration date. Nevertheless, the Hospital presents language from the PRLA that shows the ambiguity of Section 10.1. Specifically, the Hospital contends that the plain language of Section 10.1 does not require that a Patent issue within the seven-year period. In support, the Hospital refers to the PRLA's definition of the term "Patent" found in Section 1.8, which states that "'Patent(s)' means any

52

patent(s) issued under the Patent Applications." [DE 238-1 at 4]. As such, the Hospital contends that the parties intended to tie Section 10.1 expiration of the PRLA to the filing of Patent Applications, not the issuance of Patents. The Hospital buoys its argument with further references in the PRLA tying Patents and Patent Applications together. [*See Id.* at 3, § 1.7 (defining Patent Rights as "the Patent Applications plus the Patent(s), and the reissues, reexaminations, and extensions thereof."); *Id.* at 4, § 2.1 (defining DePuy's license "to make, use, sell, and offer to sell Products, and to practice the methods described in the Patent Applications for making, using, selling, and offering to sell Products."); *Id.*, § 1.9 (defining "Products" as "items covered by claims, or made or used according to the methods described by claims, in the Patent Applications or in the Patent(s).")].

DePuy acknowledges these references, but uses them to argue that the parties did not intend to tie Section 10.1 expiration to Patent Applications. DePuy argues that the parties knew how to connect Patents and Patent Applications explicitly as evidenced by these very provisions. Accordingly, DePuy concludes that the parties would have explicitly connected Patents and Patent Applications in Section 10.1 if they had intended to do so.

The extrinsic evidence presented to the Court does not clarify the parties' intent in drafting Section 10.1. The deposition testimony of the Hospital's principals in the PRLA negotiations, Dr. McKellop and the Hospital's General Counsel, Jeffrey Goldberg, reveals that they could not recall any discussion of Section 10.1 during the negotiations. [DE 238-19 at 22–24, 194:19–196:9; DE 238-21 at 10–11, 78:20–79:19]. When asked during his March 2016 deposition, however, Dr. McKellop explained the Hospital's view on why the PRLA had not expired under Section 10.1 as follows:

> In general, the idea of the agreement was that we would collaborate with DePuy,
> give them our intellectual property. They would give us theirs and put it all in the

> basket under the terms of the agreement, and they would control the patent
> application process. So we – our consideration was that – as we described in the
> agreement, that they would pay us on products whether or not a patent had yet
> issued.

[DE 302-24 at 7, 193:13–20]. Moreover, Tony Cutshall, who wrote DePuy's first letter informing the Hospital about the alleged expiration under Section 10.1, testified that he could not explain why Section 10.1 dictated expiration in the event a patent did not issue within seven years of the Effective Date. [DE 302-25 at 10, 142:13–17]. Once again, the Court is faced with reasonable but opposite interpretations of a provision of the PRLA.

The analysis cannot end there, however. Despite DePuy's argument to the contrary, any consideration of whether the PRLA expired under Section 10.1 on March 1, 2006, is dependent upon analysis of the parties' conduct between March 1, 2006, and 2012, when DePuy exercised its abandonment option under Section 6.5. The Hospital details much of this conduct in its brief. [*See* DE 301 at 25–28]. For instance, in 2007, DePuy and the Hospital worked together and communicated about issues arising from the development of AOX while DePuy employees continued its work with patent prosecution counsel on the prosecution of the 110 Family Applications. In 2008 and 2009, these activities continued. In 2009, DePuy also invoked Section 7.2(f) while seeking the Hospital's permission to disclose the financial terms of the PRLA to third parties; corresponded with Dr. McKellop about royalties under the PRLA; and participated in the choice of patent prosecution counsel.

DePuy may have honestly forgotten about Section 10.1 between 2006 and 2012. DePuy may have honestly recognized the possibility of the March 2006 expiration for the first time in 2012 when Mr. Cutshall sent his letter to the Hospital. However, its conduct between 2006 and 2012 was clearly consistent with the terms of the PRLA. DePuy does not even attempt to argue that it was not. Instead, DePuy asks the Court to apply Section 10.1 regardless of the

54

overwhelming evidence of its own conduct that it fully intended to continue obligating itself to the Hospital through the PRLA between 2006 and 2012.  The Court cannot do that.  Even if the PRLA did not expire in March 2006 because of the existence of Patent Applications as the Hospital contends, DePuy's conduct after 2006 convinced the Hospital that the PRLA was in full force and effect.  The Hospital relied upon DePuy's conduct in its own decision-making vis-à-vis the PRLA.

Therefore, while the intent of the parties in 1999 as to the meaning of Section 10.1 remains unclear, the intent and the corresponding conduct of the parties between 2006 and 2012 is absolutely clear.  The parties intended to be bound the terms of the 1999 PRLA.  In essence, by acting consistently with the terms of the PRLA, the parties may have tolled the Section 10.1 termination provision through their active, continuing, and unquestioned compliance with the rest of the PRLA's provisions.  As such, the PRLA may not have expired in March 2006 and DePuy is not entitled to judgment as a matter of law because the expiration remains a genuine issue of material fact.  Accordingly, the undersigned **RECOMMENDS** that the Court **DENY** DePuy's motion for summary judgment on the issue of the effect of Section 10.1 on the parties' contractual relationship.  [DE 251].

### ii.     Effect of Section 6.5 Abandonment on Royalties

DePuy argues that even if the PRLA did not expire in 2006, DePuy's notice of abandonment under Section 6.5 removed the 110 Family Patents and Applications from the PRLA such that DePuy owes no royalties related to the 110 Family Patents and Applications after its Section 6.5 notice date.  In its order addressing DePuy's previous motion for summary judgment, the Court addressed the identical issue of "whether the PRLA clearly and unambiguously ended DePuy's royalty obligations on Products [as defined in Section 1.9 of the

PRLA] when it exercised its Section 6.5 abandonment option." [DE 108 at 20].  After reviewing the parties' diametrically opposed interpretations of the language in the PRLA, the Court denied summary judgment regarding DePuy's continuing royalty obligations after "conclud[ing] that Section is 6.5 is ambiguous necessitating further development of the record, including extrinsic evidence." [*Id.* at 25].

With the instant motion for summary judgment, DePuy directs the Court's attention to extrinsic evidence regarding the intent of the parties related to Section 6.5.  Notably, DePuy continues to argue that Section 6.5 is unambiguous and requires no extrinsic evidence to determine the intent of the parties with regard to royalties after abandonment.  The Hospital counters that DePuy's instant motion constitutes an improper and untimely motion to reconsider the Court's previous decision finding that Section 6.5 was ambiguous as to its effect on royalties and that the parties' conflicting interpretations of the provision created a genuine dispute of material fact precluding summary judgment.  Indeed, parts of DePuy's briefing mirror that already considered by this Court with regard to the previous motion for summary judgment.  To the extent that DePuy presents identical arguments about the meaning of the plain language of Section 6.5, the Court agrees and will not further discuss those arguments.

However, the Court's February 2015 order left open a window for consideration of extrinsic evidence regarding the intent of the parties.  As such, DePuy has identified extrinsic evidence, which it contends confirms its conclusion that its abandonment eliminated any royalty obligations stemming from the 110 Family Patents and Applications.  Therefore, the Court will address DePuy's extrinsic evidence here.  Specifically, DePuy points to documentary and testimonial evidence regarding the negotiations of Section 6.5 of the PRLA and the incorporation of the Section 6.5 language into a subsequent agreement involving DePuy and the Hospital.

First, DePuy identifies a letter dated October 13, 1998, from DePuy's lawyer to the Hospital's General Counsel, Jeffrey Goldberg, including negotiations over the PRLA before it was finalized and executed on March 1, 1999. [DE 238-7]. The 1998 Letter reveals that DePuy objected to a provision regarding "New IP" in an early draft of the PRLA that was later removed. The 1998 Letter explicitly states that "DePuy believe[d] it should have an option or right of first refusal under such new intellectual property." [*Id.* at 6]. Without further citation, DePuy flatly states that "Section 6.5 was subsequently added . . . and allowed DePuy to evaluate the intellectual property developed through the Research Agreement and opt out of the license on a patent-by-patent basis (as opposed to terminating the entire agreement)." [DE 239 at 21–22].

Second, DePuy references two letters dated June 16 and 20, 2000, from the 110 Family inventor, Dr. McKellop, to Richard Tarr at DePuy. At that time, the Hospital and DePuy were negotiating to extend an agreement between the Hospital, DePuy, and USC to additional research families. Dr. McKellop's letter reported the Hospital's objections to drafts of the amendment and suggested incorporating the PRLA's existing Section 6.5, which he referred to as a "bail out" condition. [DE 238-17 at 2].

Third, DePuy cites the deposition transcript of DePuy's Rule 30(b)(6) witness, Richard Tarr, on March 16, 2016. Mr. Tar was directly involved in negotiating the PRLA on behalf of DePuy. During his deposition, he testified in response to questions about the parties' negotiations and intent for Section 6.5. [DE 238-23 at 9–10]. Tarr's testimony culminated as follows:

> Q.    And did the parties discuss the royalty payments and whether that would be affected if Depuy didn't want to continue paying for prosecution of a particular patent application?
>
> . . . .

> [Richard Tarr]:        I think what the document says, at that point, if we backed out, it's not subject to this agreement anymore and there wouldn't be any royalty payments.

[*Id.*, 165:24–166:10].

Fourth, DePuy quotes the March 18, 2016, deposition testimony of Jeffrey Goldberg, who had participated in the negotiations for the PRLA on behalf of the Hospital.  [DE 238-21]. DePuy highlights portions of Goldberg's testimony in which he states that he has no specific recollection of negotiations related to Section 6.5 or its purpose.

Lastly, DePuy reports Dr. McKellop's testimony from his deposition on March 3–4, 2016.  DePuy refers to an exchange reflected in four pages of the transcript in which Dr. McKellop responded to questions about the parties' intended meaning of Section 6.5.  During that exchange, Dr. McKellop stated that "[DePuy] would have the ability to make and sell products and pay royalties . . . ."  [DE 238-19 at 37, 213:23–24].  As to discussions in the negotiation of the PRLA that supported finding that royalties would be due even after a Section 6.5 abandonment, Dr. McKellop repeated multiple times using slightly different words that

> [e]very component of the agreement was discussed, negotiated, and agreed to, and, then, both sides worked together back and forth to implement those in the written agreement.  So, if there's something in the written agreement, naturally, it was negotiated beforehand.

[*Id.* at 40, 216:10–15].

Based on this combination of extrinsic evidence, DePuy argues that its interpretation that abandonment under Section 6.5 eliminates any royalty obligation is the only reasonable interpretation.  DePuy contends that Dr. McKellop's testimony is the Hospital's only evidence that the parties' intended for a continuing royalty obligation and that his testimony is uncorroborated.  DePuy further asserts that the 1998 and 2000 letters combined with Mr. Tarr's testimony confirm DePuy's interpretation.

58

Yet, even considering this extrinsic evidence and its reasonable inferences, DePuy still does not resolve the question of Section 6.5 intended meaning as to royalties after abandonment. The 2000 Letters from Dr. McKellop referencing the "bail-out" condition do not say as much as DePuy contends. Dr. McKellop clarified in his deposition that "'bailing out' refers to choosing to not continue paying for and prosecuting the patent." [DE 302-24 at 13, 238:2–3]. And while DePuy challenges as uncorroborated Dr. McKellop's testimony that the parties intended for the royalty obligation to remain, Mr. Tarr's testimony is equally uncorroborated. Mr. Tarr references no specific discussions or documents in support of his conclusion. The 1998 and 2000 Letters are likely relevant, but similarly do not tackle the question before this Court head on. As such, the same ambiguities found by this Court in February 2015 still remain. DePuy and the Hospital each still vehemently advocate its allegedly indisputable interpretation of the plain language of Section 6.5 and the extrinsic evidence presented by DePuy fails to clarify the issues already identified by this Court.

Therefore, genuine disputes of material fact remain as to the effect of DePuy's Section 6.5 abandonment on its obligation to pay royalties. Accordingly, the undersigned **RECOMMENDS** that the Court **DENY** DePuy's motion for summary judgment on the issue of the meaning of Section 6.5 of the PRLA. [DE 251]

### 3.    Contract Issues Conclusion

For the reasons stated above, the undersigned finds that issues of fact remain regarding the expiration date of the PRLA pursuant to Section 10.1 on March 1, 2006. In addition, the undersigned finds that genuine disputes of material fact remain as to the effect of DePuy's Section 6.5 abandonment on its obligation to pay royalties. Therefore, the undersigned **RECOMMENDS** that the Court **DENY** DePuy's motion for summary judgment on both the

issue of the effect of Section 10.1 on the parties' contractual relationship and the issue of the meaning of Section 6.5 of the PRLA.  [DE 251]

IV.    CONCLUSION

For the reasons stated above, the undersigned now

(1)    **RECOMMENDS DENYING WITHOUT PREJUDICE** the Hospital's motions to strike [DE 256, 305] and allowing the Hospital to file related motions in limine at a later date in anticipation of trial, as necessary;

(2)    **RECOMMENDS DENYING** DePuy's motions for summary judgment for invalidity [DE 241, 243];

(3)    **RECOMMENDS DENYING** DePuy's motion for summary judgment based on non-infringement [DE 251]; and

(4)    **RECOMMENDS DENYING** DePuy's motion for summary judgment on contract issues [DE 236].

Lastly, the Court has already ordered that much of the parties' briefing and accompanying exhibits related to the instant motions be maintained under seal in keeping with the parties' designations of confidential information established in this Court's protective order.  [*See* DE 314, 316, 317, 328, 332, 340].  To protect any legitimately confidential information, the Court now **DIRECTS** the Clerk to retain this order under seal until **August 4, 2017**.  The Court will consider any redaction request filed by **August 4, 2017**.  If no redaction request is filed by August 4, 2017, this order will be unsealed. The Court **ADVISES** the parties that this action is a public proceeding and that the Court will not redact or seal its order without careful consideration of the rights of the public in keeping with the Seventh Circuit's requirements in *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 944 (7th Cir. 1999).

**NOTICE IS HEREBY GIVEN that within fourteen (14) days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings and/or**

**recommendations. Fed. R. Civ. P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.**

**SO ORDERED.**

Dated this 19th day of July 2017.

s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge